**Certiorari Granted, January 17, 2012, No. 33,353**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-009**

**Filing Date: November 17, 2011**

**Docket No. 29,933**

**EDWARD R. FLEMMA,**

      **Plaintiff-Appellee,**

**v.**

**HALLIBURTON ENERGY SERVICES, INC., RICK GRISINGER, RICHARD MONTMAN, and KARL E. MADDEN,**

      **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**James A. Hall, District Judge**

Guebert Bruckner P.C.
Terry R. Guebert
Don Bruckner
Albuquerque, NM

for Appellee

Jackson Lewis LLP
Danny W. Jarrett
James L. Cook
Albuquerque, NM

Vinson & Elkins LLP
W. Carl Jordan
Corey E. Devine
Houston, TX

for Appellants

**OPINION**

**SUTIN, Judge.**

**{1}**     Edward R. Flemma, an employee of Defendant Halliburton Energy Services, Inc. (Halliburton), was terminated allegedly for voicing opposition to a proposed location for a new Halliburton facility, and he sued Halliburton and three of its employees claiming wrongful and retaliatory discharge. Defendants appeal the district court's refusal to compel arbitration. We reverse, holding that (1) under Texas law there was sufficient evidence of Flemma's acceptance of and assent to a contractual arbitration program when Halliburton mailed the terms to Flemma, and Flemma accepted the terms by continuing employment with Halliburton; (2) the differences between Texas and New Mexico in terms of the evidence required to prove acceptance and assent are insufficient to overcome application of the place-of-contract-formation rule on public policy grounds and, thus the arbitration agreement should be enforced under Texas law, which was the state where the contract was formed; and (3) under Texas law the arbitration agreement was not illusory and was therefore supported by consideration.

**BACKGROUND**

**{2}**     Flemma was hired by Halliburton in 1982 in Louisiana. During his twenty-six years of employment with Halliburton, Flemma received numerous promotions**,** including his latest promotion, in 2006, to district manager for the company in Farmington, New Mexico. Flemma was involved in evaluating the move of three Halliburton facilities from established locations in Farmington to a more suitable, consolidated location. Halliburton considered two locations for the consolidated facility—Troy King, within Farmington's city limits, and Crouch Mesa, outside the city limits. For various reasons, Flemma opposed the Troy King location.

**{3}**     The facts surrounding Flemma's termination are undisputed. In August 2006, Flemma and Defendant Karl Madden, a district sales manager for Halliburton, received a warning from Defendant Richard Montman, Flemma's supervisor, that "if you value your career, you will keep your mouth shut about the Troy King property." The day after this warning, Defendant Rick Grisinger, a vice president of Halliburton, told Flemma to stop making "negative comments" regarding Troy King. According to Flemma's complaint, Madden complied with Montman's and Grisinger's directives to "keep his mouth shut," while Flemma continued to voice his concerns regarding the Troy King facility. In July 2007, Flemma prepared an executive summary in which he compared the two separate locations and indicated that he favored the Crouch Mesa location.

**{4}**     In April 2008, Montman told Flemma, "Today is your last day with the company, you are not meeting my expectations." Flemma was given the option of signing a resignation, general release, and settlement agreement, as well as accepting twelve weeks of base salary, or being fired. He refused to sign the documents and was fired. He stated in

2

an affidavit filed in this action that he was terminated in retaliation for not keeping his mouth shut about his concerns related to the Troy King facility. Madden was promoted to Flemma's position with the company after Flemma was fired.

{5}     In response to these events, Flemma filed a complaint in the district court for wrongful and retaliatory discharge against Halliburton, Grisinger, Montman, and Madden (collectively, Defendants). Defendants responded by filing a motion to compel arbitration. As part of their motion, Defendants provided evidence to the court of four separate mailings by which Halliburton notified Flemma that continued employment with the company constituted his acceptance of the terms of Halliburton's Dispute Resolution Program (the Program), which included binding arbitration of all employment-related disputes. Each of the mailings was sent to Flemma while he was working for Halliburton either in Texas or in Louisiana. Halliburton maintained a record of all the Program packets that were returned to Halliburton by the post office as undeliverable. None of the packets sent to Flemma was returned as undeliverable.

{6}     In December 1997, while Flemma was working for Halliburton in Texas, the corporation notified him in writing of its adoption of the Program, effective January 2, 1998, and of the fact that continuing employment with Halliburton indicated agreement to be bound by the Program. The Program offered various alternatives that employees could use to resolve disputes with Halliburton, including a hotline, trained professionals who could assist in various ways confidentially and neutrally, known as Ombudsmen, and a legal consultation plan. The Program included, as a final step, arbitration of all disputes in accordance with the "Halliburton Dispute Resolution Plan" (the Plan). The notification packet included a copy of the Plan and its Rules (the Rules), a brochure describing the Program's basic components, a trifold summary of the Program, and a transmittal letter. The packet was mailed to Flemma's address of record in Tomball, Texas. The second mailing also went to Flemma's address of record in Tomball in the spring of 1998. The 1998 mailing included a transmittal letter, and a revised edition of the Plan and the Rules that again stated that continuing employment with Halliburton constituted consent to be bound by the Plan.

{7}     In the summer of 1999, Flemma was working for Halliburton in Louisiana when it mailed a package to his address of record in Belle Chasse, Louisiana, an updated version of the brochure describing the Program's components, which became effective in August 1999, along with a current edition of the Plan and the Rules, and a transmittal letter. This package was mailed to all employees of Halliburton-related companies, again notifying them of the binding effect of the Program. And in October 2001, when Flemma was working for Halliburton, again in Texas, the corporation mailed to his address of record, which was then the address of his business office in Bellaire, Texas, another copy of the Plan and the Rules, a descriptive brochure of the Program, again stating that continuing employment with Halliburton constituted consent to be bound by the Program, and a transmittal letter reminding him that each employee in the United States has agreed to utilize the Program.

3

**{8}** On November 4, 2003, Flemma signed a Secondment Agreement in which Halliburton agreed to "second" Flemma to Halliburton International Inc. By the terms of the agreement, Flemma would remain employed by Halliburton, pursuant to an international assignment, which was contained in a separate document also dated November 4, 2003, effective January 1, 2004. The Secondment Agreement permitted Flemma to work for Halliburton International in accordance with a set of conditions described therein. Among those conditions in the Secondment Agreement was a provision that incorporated the terms of the Program. The Secondment Agreement stated that the Program applied to all Halliburton employees "from or working in the [United States]."

**{9}** Under the Rules, Halliburton reserved the right to amend the Plan at any time by giving at least ten days notice to current employees. The Rules further provided that no amendment would apply to a dispute for which a proceeding had been initiated. A rule governing termination of the Plan was identical to the foregoing rule governing amendment and allowed Halliburton to terminate the Plan at any time, provided that ten days notice had been given to current employees, and provided that the termination would not apply to any proceeding that had already been initiated.

**{10}** In an affidavit, Flemma stated that he did not remember ever seeing the dispute resolution material while working in Texas and Louisiana from 1997 to 2001. He also stated that he did not "recall receiving, opening[,] or reading this material, or being conscious of the fact that by remaining on the job with Halliburton . . . in the United States, [he] would be accepting an agreement to arbitrate any disputes [he] had with the company." Flemma stated that the materials may have been disposed of by his ex-wife, with whom he was living during 1997 to 2000.

**{11}** The district court denied Defendants' motion to compel arbitration on two grounds. First, the district court held that the agreement to arbitrate was unenforceable because it would be viewed as illusory under New Mexico law. The court's holding was based on the premise that Halliburton would have "unfettered discretion to [modify the Plan] after a claim accrue[d], but before the claim [was] filed." The district court was also not persuaded that the ten-day rule that restricted Halliburton from modifying the Plan was sufficient to overcome its illusory nature, in part, because it was only applicable to current employees. Thus, someone in Flemma's circumstances, whose claim had already accrued and who would not be considered a current employee would not receive a ten-day notice. Second, the district court applied the public-policy exception that pertains to the application of foreign law and held that "enforcing an agreement solely on the basis of mailing, without affirmative evidence of acceptance or mutual assent, particularly when it relates to the surrender of a right to a jury trial, would be contrary to public policy."

## DISCUSSION

**{12}** Defendants contend that the district court erred in holding that Flemma did not agree to arbitrate disputes with Halliburton. Defendants argue that Texas and Louisiana law

4

applied and that, under either state's applicable law, Flemma accepted and assented to the Program as a condition of his employment with Halliburton; thus, the district court erred in refusing to determine the validity of Flemma's agreement to arbitrate under the law of either state. In this Opinion, only Texas law need be addressed. In addition, Defendants argue that in signing the Secondment Agreement, Flemma was on notice that the Program as it applied to employees working in the United States would continue to apply to employees while on assignment outside the United States. Finally, Defendants contend that the agreement to arbitrate was not illusory and was therefore supported by consideration.

**Standard of Review**

**{13}** We review de novo a district court's denial of a motion to compel arbitration. *Piano v. Premier Distrib. Co.*, 2005-NMCA-018, ¶ 4, 137 N.M. 57, 107 P.3d 11; *Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 4, 134 N.M. 558, 80 P.3d 495. Likewise, "[w]hether the parties have agreed to arbitrate is a question of law; we review the applicability and construction of a provision requiring arbitration de novo." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 51, 131 N.M. 772, 42 P.3d 1221. We also review choice-of-law analyses, as well as the interpretation of New Mexico law, under a de novo standard. *Nat'l Bank of Ariz. v. Moore*, 2005-NMCA-122, ¶ 7, 138 N.M. 496, 122 P.3d 1265.

**Under Texas Law Flemma Accepted and Assented to the Program and Application of Texas Law Does Not Violate New Mexico Public Policy**

**{14}** Under Texas law, there is a presumption of receipt that applies to mail which has been properly addressed, stamped, and sent through a postal service. *Wesco Distribution, Inc. v. Westport Group, Inc.*, 150 S.W.3d 553, 561 (Tex. Ct. App. 2004). The presumption that materials sent through the mail have been received may be rebutted by affirmative denial of receipt. *See Wembley Inv. Co. v. Herrera*, 11 S.W.3d 924, 927 (Tex. 1999) (per curiam). In the context of changes to an employment agreement, once an employer has provided unequivocal notice of a change in the terms of the agreement, an employee who continues working is deemed to have accepted the new terms. *In re Halliburton Co.*, 80 S.W.3d 566, 568-69 (Tex. 2002). "Generally, when [an] employer notifies an employee of changes in employment terms, the employee must accept the new terms or quit. If the employee continues working with knowledge of the changes, he has accepted the changes as a matter of law." *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986).

**{15}** It appears that the district court assumed, without deciding, that under Texas law Flemma would be deemed to have accepted the terms of the Program. We agree with Defendants that, under Texas law, mutual assent and acceptance of the Program and hence an agreement to arbitrate existed between Halliburton and Flemma. Flemma does not argue otherwise.

**{16}** As a Halliburton employee living and working in Texas when notice of the Program was initially sent to his address, Flemma's continued employment constituted acceptance of

the terms of the Program, including the arbitration requirement under Texas law. *See In re Halliburton Co.*, 80 S.W.3d at 568-69 (holding that an employee accepted, as a matter of law, changes to an employment agreement by continuing employment with the company after he received notice of the changes). Halliburton subsequently reaffirmed the offer by sending the Program materials to Flemma in Texas, once at his home address, and once at his office within Halliburton. Flemma did not affirmatively deny receiving the materials. In light of these mailings, which would be considered unequivocal notice of changes to his employment agreement by Texas courts and which, under Texas law, are presumed to have been received, Flemma's continued employment with Halliburton constituted acceptance of the terms of the Program under the law of that state.

**{17}**　Defendants argue and we agree that, as an agreement was formed in Texas, "allowing Flemma to escape his obligations under the agreement simply because he was working in New Mexico when his claim arose would be inconsistent with contractual expectations of the parties[.]" *See Shope v. State Farm Ins. Co.*, 1996-NMSC-052, ¶ 7, 122 N.M. 398, 925 P.2d 515 (stating that "as Virginia residents . . ., [the plaintiffs] should have expected that the laws of Virginia would be applied to their various transactions"). Moreover, as the plain language of the Program states, once the parties agreed to be bound by the Program, they intended to be bound by their agreement at all times during and after the employment relationship. Insofar as the terms here included agreeing to arbitrate all employment-related disputes with Halliburton, Texas law would bind Flemma to that agreement.[1]

**{18}**　In evaluating whether an enforceable agreement to arbitrate existed, the district court held that applying Texas law and "enforcing an agreement solely on the basis of mailing, without affirmative evidence of acceptance or mutual assent, particularly when it relates to the surrender of a right to a jury trial, would be contrary to [New Mexico] public policy." In reaching this conclusion, the court followed *Reagan v. McGee Drilling Corp.*, 1997-NMCA-014, ¶ 8, 123 N.M. 68, 933 P.2d 867, which stated that under the conflict-of-laws rules, New Mexico "may decline to apply the out-of-state law if it offends New Mexico public policy."

**{19}**　According to Defendants, the district court's invocation of the public-policy exception was erroneous under the facts of this case. Defendants argue that the underlying policies of Texas and New Mexico strongly favor freedom of contract and require enforcement of contracts. *See United Wholesale Liquor Co. v. Brown-Forman Distillers*

---

[1] *See, e.g.*, *In re Halliburton Co.*, No. 01-09-00150-CV, 2009 WL 1886659, at *2, 4-5 (Tex. Ct. App. July 2, 2009) (mem.) (holding that the plaintiff, a former Halliburton employee, was bound to arbitrate disputes in compliance with the program in spite of his contention that he never received the program materials by mail because "Halliburton provided uncontroverted evidence that copies of the . . . [program] materials were sent to [the plaintiff] in a properly addressed packet" and receipt of the materials was therefore presumed).

6

*Corp.*, 108 N.M. 467, 471, 775 P.2d 233, 237 (1989) (stating that New Mexico "has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals"); *Merry Homes, Inc. v. Chi Hung Luu*, 312 S.W.3d 938, 950 (Tex. Ct. App. 2010) (stating that "[t]he Texas Supreme Court has long recognized Texas' strong public policy in favor of preserving the freedom of contract" (internal quotation marks and citation omitted)). Defendants also point to the fact that in both states the elements of a contract are the same: offer, acceptance, consideration, and mutual assent. *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 121 N.M. 728, 918 P.2d 7; *Turner-Bass Assocs. of Tyler v. Williamson*, 932 S.W.2d 219, 222 (Tex. Ct. App. 1996). The only difference between Texas and New Mexico law, Defendants contend, is the evidentiary showing that a party must make to establish certain elements of acceptance and mutual assent.

**{20}** Again, Texas courts presume receipt of materials that have been sent through the mail provided they are sent with proper postage and addressed correctly. *Wesco Distribution, Inc.*, 150 S.W.3d at 561. And this presumption applies in the context of changes to an employment agreement where an employee continues working after notice of the changes was mailed. *In re Halliburton Co.*, 80 S.W.3d at 568-69. This Court, however, has taken a more restrictive view.

**{21}** In *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 15, 134 N.M. 630, 81 P.3d 573, although we recognized the general presumption that materials mailed to a correct address have been received, we declined to apply that presumption in the context of changes to an at-will employment agreement. We determined that proof of conscious assent is "particularly crucial in the at-will employment context, where acceptance may be manifested by continuing in a routine activity" such as continuing to go to work. *Id.* ¶ 18. Consequently, we held that an employer is required to prove that an employee had actual knowledge of an offer and actual knowledge that continued employment with the company constituted acceptance of that offer. *Id.* ¶ 23. *DeArmond* does not require rejection of Texas law in this case.

**{22 }** "As a general proposition of law, it is settled that the validity of a contract must be determined by the law of the state in which it was made." *Boggs v. Anderson*, 72 N.M. 136, 140, 381 P.2d 419, 422 (1963). New Mexico has "a strong public policy in favor of freedom to contract which requires enforcement of contracts unless they clearly contravene some law or rule of public morals or violate some fundamental principle of justice." *Reagan*, 1997-NMCA-014, ¶ 15 (internal quotation marks and citation omitted). Yet, "[s]imple differences in laws among states [do] not rise to this level." *Id.* Instead, "[t]o overcome the rule favoring the place where a contract is executed, there must be a countervailing interest that is fundamental and separate from general policies of contract interpretation." *State Farm Mut. Auto. Ins. Co. v. Ballard*, 2002-NMSC-030, ¶ 9, 132 N.M. 696, 54 P.3d 537 (internal quotation marks and citation omitted).

7

**{23}** In order to prevent the exception from swallowing the rule, "courts should invoke [the] public policy exception only in extremely limited circumstances." *Reagan*, 1997-NMCA-014, ¶ 9 (internal quotation marks and citation omitted). "Mere differences among state laws should not be enough to invoke the public policy exception." *Id.* "Otherwise, since every law is an expression of a state's public policy, the forum law would always prevail unless the foreign law were identical, and the exception would swallow the rule." *Id.* The threshold question "is whether giving effect to another state's policies would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal of the forum state." *Id.* (internal quotation marks and citation omitted).

**{24}** Our issue, then, is whether the district court correctly applied the public-policy exception in refusing to apply Texas law on the acceptance and assent issue when the sole conflict between Texas and New Mexico law involves only evidentiary requirements of contract formation. We ask whether *DeArmond*'s requirement of affirmative evidence of acceptance or mutual assent in contract formation is a fundamental public policy such that the application of Texas law, which does not impose such a requirement, would violate some "fundamental principle of justice, some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal" of New Mexico. *Reagan*, 1997-NMCA-014, ¶ 9 (internal quotation marks and citation omitted).

**{25}** Flemma directs our attention to cases in which New Mexico courts have determined that the application of the law of another state would offend a fundamental New Mexico public policy. Flemma relies on *Ballard*, 2002-NMSC-030, and on *Demir v. Farmers Texas County Mutual Ins. Co.*, 2006-NMCA-091, 140 N.M. 162, 140 P.3d 1111. These cases identified the protection of innocent automobile accident victims as a fundamental New Mexico public policy that required the application of New Mexico law, rather than the law of the state in which the contract had been formed. *Ballard*, 2002-NMSC-030, ¶¶ 10, 13-14, 19; *Demir*, 2006-NMCA-091, ¶¶ 15, 20, 22-23. In *Ballard*, a Georgia insurance policy excluded household family members from bodily injury coverage. 2002-NMSC-030, ¶ 4. In determining that it would not apply Georgia law to the contract, our Supreme Court held that "the reduction in coverage for a discrete group of individuals . . . based solely on their familial relationship to the insured, implicate[d] a fundamental principle of justice" and violated New Mexico statutory and common law. *Id.* ¶¶ 10-11. This Court followed suit in *Demir* when we declined to enforce an uninsured motorist exclusion found in an insurance policy purchased in Texas. 2006-NMCA-091, ¶ 15. As *Ballard* and *Demir* indicate, New Mexico courts will apply New Mexico law to automobile insurance contracts that were formed in other states if innocent accident victims would be otherwise unprotected.

**{26}** In *Piña v. Gruy Petroleum Mgmt. Co.*, 2006-NMCA-063, ¶ 1, 139 N.M. 619, 136 P.3d 1029, a third case on which Flemma relies, this Court identified a statutory provision known as the Oilfield Anti-Indemnity Statute, NMSA 1978, § 56-7-2 (1999) (amended 2003), as an expression of a fundamental principle of justice that insures the safety of persons and property at oil-well sites in New Mexico. *Piña* held that a Texas anti-indemnity

8

statute that "allowed indemnity agreements indemnifying a party against its own negligence where the indemnitor's obligation [was] covered by liability insurance" was "fundamentally inconsistent with important New Mexico public policy[.]" 2006-NMCA-063, ¶¶ 12, 21. And this Court therefore determined that any agreement that invoked foreign law that was contrary to the Oilfield Anti-Indemnity Statute would be considered "void and unenforceable in New Mexico courts." *Id.* ¶ 22.

**{27}** Flemma's final authority is *Fiser v. Dell Computer Corp.*, 2008-NMSC-046, 144 N.M. 464, 188 P.3d 1215. At issue in *Fiser* was a set of agreed-upon terms and conditions that contained, among other things, a choice-of-law provision that declared Texas law controlled. *Id.* ¶ 4. The terms and conditions also included a clause that banned class action law suits. *Id.* Our Supreme Court employed a choice-of-law analysis and determined that application of Texas law under the facts of that case would violate New Mexico public policy. *Id.* ¶¶ 6-18. Specifically, the Court held that "in the context of small consumer claims that would be prohibitively costly to bring on an individual basis, contractual prohibitions on class relief are contrary to New Mexico's fundamental public policy of encouraging the resolution of small consumer claims and are therefore unenforceable in this state." *Id.* ¶ 1.

**{28}** The cases upon which Flemma relies did not, as here, involve the application of the public-policy exception to evidentiary proof requirements of contract formation. And, unlike *Ballard*, *Piña*, or *Demir*, in which the law of another state would effectively favor the protection of insurance companies over the safety of people in New Mexico, here, there is a mere difference in state law requirements of proof regarding elements of contract formation. Texas law on this matter does not affront or offend a fundamental New Mexico public policy. *Cf. Shope*, 1996-NMSC-052, ¶ 9 (applying Virginia law to an insurance contract that allowed stacking of uninsured motorist coverage in spite of a New Mexico law which prohibited it because the difference was a matter of contract interpretation that did not rise to the level of a fundamental principle of justice). As well, unlike the plaintiff in *Fiser*, application of Texas law to the agreement before us would not foreclose Flemma from pursuing his claim; rather, he will have the opportunity do so in arbitration.

**{29}** We think there is little question that Texas courts would determine the assent and mutuality issue in favor of Defendants. Further, the facts surrounding Flemma's direct and express agreement in the Secondment Agreement relating to the Program cements Flemma's knowledge of the Program's application to him while he was working both in the United States and abroad.

**{30}** On a final note, we are unpersuaded by Flemma's argument that because he gave up the right to a trial by jury enforcement of his agreement to be bound by the Program, without proof of his actual knowledge of the offer or of an affirmative showing of mutual assent and acceptance, would be contrary to fundamental New Mexico policy. We see no reason why an employee cannot agree to arbitration and thereby give up his right to a jury through the constructive mail-receipt process allowed under Texas law. The fundamental public policy

at issue is not that of a right to and waiver of a jury trial. The issue is whether a person should be bound by a valid contract agreeing to arbitration instead of a jury trial under the evidentiary proof permitted by Texas law but arguably inadequate under New Mexico law.[2] Where parties have agreed to it, "New Mexico has a strong public policy in favor of arbitration as a form of dispute resolution[.]" *Durham v. Guest*, 2009-NMSC-007, ¶ 32, 145 N.M. 694, 204 P.3d 19. New Mexico law is indisputable that "controversies should be resolved by arbitration where contracts or other documents so provide[,]" and "[w]hen a party agrees to a non-judicial forum for dispute resolution, the party should be held to that agreement." *Lisanti v. Alamo Title Ins. of Tex.*, 2002-NMSC-032, ¶ 17, 132 N.M. 750, 55 P.3d 962 (internal quotation marks and citation omitted).

{31}    We conclude that Texas law applies and that the public-policy exception should not have been invoked on the contract formation issue. The mere differences between Texas and New Mexico in terms of the evidence required to prove acceptance of and assent to an agreement are not sufficient to overcome the place-of-formation rule on public-policy grounds. Thus, we hold that the arbitration agreement should be enforced under Texas law rather than that of New Mexico and, under Texas law, Defendants presented sufficient proof of Flemma's acceptance of and assent to the agreement to bind him to arbitration.

**The Arbitration Agreement was not Illusory**

{32}    The district court did not make any findings with regard to whether the arbitration agreement was illusory under Texas law. Nor did the court address or attempt to determine whether Texas law on this issue was contrary to a fundamental New Mexico policy. Also noteworthy, Flemma did not attack the agreement on the ground that it was unconscionable. Flemma's position below and on appeal is that the agreement lacked consideration because it was illusory. The court thought that the circumstances fell "nicely between" *Salazar v. Citadel Commc'ns Corp.*, 2004-NMSC-013, 135 N.M. 447, 90 P.3d 466, and *Sisneros v. Citadel Broad. Co.*, 2006-NMCA-102, 140 N.M. 266, 142 P.3d 34, and held that it was illusory under New Mexico law because, contrary to *Salazar*, the arbitration agreement allowed Halliburton unfettered discretion to modify the Plan after a claim accrued, but before a proceeding had been initiated. Without addressing Texas law, Flemma encourages this Court to affirm the district court's ruling that the arbitration agreement was illusory.

{33}    The holdings in *Salazar* and *Sisneros* differentiate two versions of an arbitration agreement between the defendant and the respective employees. *Salazar*, 2004-NMSC-013, ¶ 1; *Sisneros*, 2006-NMCA-102, ¶¶ 1, 32-33. In *Salazar*, our Supreme Court determined that an arbitration agreement was illusory because the employer retained unfettered discretion to modify the agreement. 2004-NMSC-013, ¶¶ 1, 11. In *Sisneros*, however, this Court determined that the arbitration agreement at issue was supported by consideration because

---

[2]    Our holding is not meant to indicate whether New Mexico law would allow a presumption that Flemma received the Program materials by mail.

10

it restricted the defendant's right to amend or terminate the agreement once an employee's claim had accrued. *Sisneros*, 2006-NMCA-102, ¶ 35. Thus, in *Sisneros*, the restriction on the defendant's right to amend provided consideration for the agreement making it "in no way illusory[.]" *Id.*

**{34}** Defendants argue that under both Texas and New Mexico law the agreement was not illusory and was therefore supported by consideration. Having determined that Flemma's agreement to arbitrate pursuant to the Program should be construed under Texas law, we limit our discussion of the issue to the law of Texas. Under Texas law, mutuality of obligation is sufficient consideration for a contract. *See In re Halliburton Co.*, 80 S.W.3d at 569 (holding that the agreement was not illusory because it was supported by consideration insofar as the employee and employer were equally bound by a promise to arbitrate disputes). So long as the right is restricted, one party to an agreement may reserve the right to unilaterally amend or terminate the agreement. *See id.* at 569-70 (rejecting the assertion that the arbitration agreement was illusory based, among other reasons, on the fact that a ten-day notice was required before amendments could be made and that modifications would only apply prospectively). Thus, a "[m]utual agreement to arbitrate claims provides sufficient consideration to support an arbitration agreement" and arbitration clauses will not be held illusory "unless one party can avoid its promise to arbitrate by amending the provision or terminating it altogether." *In re 24R, Inc.*, 324 S.W.3d 564, 566-67 (Tex. 2010).

**{35}** Defendants argue that Halliburton's promise to arbitrate disputes was not illusory because the company was restricted from amending the Program in two important ways. First, Defendants note, Halliburton must provide its employees with a ten-day notice before it modifies or terminates the Plan. Second, no modification of the Plan or the Rules can apply to a proceeding that has already been initiated pursuant to the Rules. The relevant provisions read as follows:

> 6. Amendment
>
> A. This Plan may be amended by [Halliburton] at any time by giving at least 10 days notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules.
>
> B. [Halliburton] may amend the Rules at any time. . . . However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules.

**{36}** In support of their proposition that Halliburton's promise to arbitrate disputes in accordance with the Program was not illusory, Defendants rely on four cases: *Dodds v.*

11

*Halliburton Energy Servs., Inc.*, 273 F.3d 1094 (5th Cir. 2001) (per curiam), *Pierce v. Kellogg, Brown & Root, Inc.*, 245 F. Supp. 2d 1212 (E.D. Okla. 2003), *In re Halliburton Co.*, 80 S.W.3d 566, and *In re Champion Techs, Inc.*, 222 S.W.3d 127 (Tex. Ct. App. 2006). *Dodds*, 273 F.3d 1094, is an unpublished summary calendar decision and would not be considered by Texas courts. *See Ditto v. State*, 898 S.W.2d 383, 384 n.1 (Tex. Ct. App. 1995) (stating that "[u]npublished opinions are not to be cited as authority").

{37} In *In re Champion Techs*, a Texas appellate court considered facts and arguments similar to those made by the parties in this case. 222 S.W.3d at 129-34. There, three former employees filed a lawsuit against their former employer alleging wrongful termination. *Id.* at 129. The employer filed a motion to compel arbitration pursuant to an agreement known as the "Champion Technologies Dispute Resolution Program." *Id.* (internal quotation marks omitted). The trial court ruled that the dispute resolution program was illusory based on its amendment and termination sections. *Id.* at 131. The employer appealed. *Id.* at 129-30.

{38} In *In re Champion Techs*, the amendment section read as follows: "This Program may be amended by [the employer] at any time by giving at least 30 days' notice to current [e]mployees. However, no amendment shall apply to a [d]ispute for which a proceeding has been initiated pursuant to the [r]ules, unless otherwise agreed." *Id.* at 131. The termination section read:

> This Program may be terminated by [the employer] at any time by giving at least 30 days' notice of termination to current [e]mployees. However, termination shall not be effective as to [d]isputes for which a proceeding has been initiated pursuant to the [r]ules prior to the date of termination unless otherwise agreed.

*Id.* Relying on the language of these two provisions, the plaintiffs argued that the agreement was illusory as it applied to them because the employer was not required to give notice to former employees of amendments to or termination of the program. *Id.* at 132.

{39} The Texas Court of Appeals rejected the plaintiffs' argument that the agreement was illusory. The appellate court concluded that the employer did not have the contractual right to amend or terminate the program or its rules after an arbitration was initiated under the program, regardless of the status of the plaintiffs as "former employees." *Id.* This was significant, the court explained, because the plaintiffs were required by the terms of the program to initiate arbitration in order to resolve their dispute with the employer. *Id.* If they had done so, the court reasoned, the employer "could not have avoided its promise to arbitrate by either amending or terminating the [p]rogram itself or the [r]ules." *Id.* (internal quotation marks omitted). In so concluding, the appellate court relied on the reasoning of *In re AdvancePCS Health L.P.*, 172 S.W.3d 603 (Tex. 2005) (per curiam). *In re Champion Techs.*, 222 S.W.3d at 132-33.

12

**{40}** In *In re AdvancePCS*, the owners of several pharmacies sued a company that processed and adjudicated claims for reimbursement between member pharmacies and customers' health care providers. 172 S.W.3d at 605. The plaintiffs, by virtue of enrolling in the company's network, agreed to arbitrate all disputes that arose between them and the company. *Id.* at 605-06. When the plaintiffs brought a claim in court alleging that they had been underpaid by the company for over a decade, the company filed a motion to compel arbitration. *Id.* at 605. The case went to the Texas Supreme Court, where the plaintiffs argued, among other things, that the arbitration agreement was illusory because the company reserved the right to cancel the arbitration agreement at will. *Id.* at 607. The Texas Supreme Court noted a provision in the agreement that prevented the agreement from being terminated without the company first providing a thirty-day notice to the network members. *Id.* The court thus held that, "[h]ad the [plaintiffs] invoked arbitration rather than filing suit, [the company] could not have avoided arbitration by terminating the [p]rovider [a]greement" and, therefore, the agreement was not illusory. *Id.* at 607-08.

**{41}** In *In re Halliburton Co.*, an employee, who was demoted but was still a "current employee," argued on appeal, among other claims, that the plan was illusory.[3] 80 S.W.3d at 567-68. The court held that the ten-day-notice provision sufficiently restricted the company's right to unilaterally amend or terminate the program. *Id.* at 569-70. Therefore, the plan was held not to be illusory. *Id.* at 570.

**{42}** In *Pierce*, the court held with regard to the plan[4] that the "prospective application of the amendment or termination provisions, when combined with the ten-day notice provision, constitute[d] a significant limitation on [the company's] right to modify, amend, or cancel such that the agreement to arbitrate [was] not an illusory one." *Id.* at 1215. There, although the plaintiffs were former employees of the company, it does not appear that the court specifically considered whether, as it applied to former employees who would not receive notice of modifications, the plan was illusory. The court based its holding on the fact that the contract generally imposed limitations on the company's right to modify or amend the agreement and, therefore, it was not illusory. *Id.* In our view, Texas courts would not view the agreement at issue in the present case to be illusory as it pertained to Flemma.

**{43}** As in *In re Champion Techs*, Halliburton's right to amend or terminate the Plan was restricted by a notice requirement and by the condition that no amendment to or termination of the Plan would apply to disputes for which a proceeding had been initiated pursuant to the Rules. *See* 222 S.W.3d at 132. Flemma was required by the terms of the Plan to submit his claim to arbitration. As explained in *In re AdvancePCS*, 172 S.W.3d at 607-08, and in *In re*

---

[3] The Plan at issue in the present case is the same plan that was at issue in *In re Halliburton Co.*, 80 S.W.3d at 568, n.1.

[4] In *Pierce*, the defendant was a subsidiary of Halliburton, and the plan at issue in the present case is the same plan that was at issue in *Pierce*. 245 F. Supp. 2d at 1213 n.1.

*Champion Techs*, 222 S.W.3d at 132, had Flemma submitted his wrongful and retaliatory discharge claim to arbitration, as he was contractually obligated to do, Halliburton could not have avoided its promise to arbitrate. While we recognize that *In re Halliburton Co.*'s facts are different because the plaintiff in that case was a current employee and, in *Pierce*, the court did not specifically address the issue that Flemma argues regarding former employees. Nevertheless, these cases provide support for our view that the arbitration agreement in this case was not illusory.

**{44}** Finally, and importantly, Flemma's claim accrued at the time he was fired, and Halliburton certainly had notice of a possible claim at that time, given the background leading up to, and the circumstances of, the firing. Halliburton's right to amend any aspect of the Plan or the Rules as they existed in the Flemma-Halliburton agreement ended the moment Flemma was fired because the contractual relationship in terms of continuing employment was severed at that time. Flemma could have filed his arbitration, and Halliburton could have done nothing by way of amendment or termination of the Plan or the Rules that would have affected Flemma's right to arbitrate under the agreement as it existed at the time he was fired. The district court's view that Halliburton's discretion to amend or terminate the Plan or the Rules, as they existed at the time of Flemma's firing, was "unfettered" has no legal or factual support, and the district court erred in that regard. We hold that under Texas law, the arbitration agreement was not illusory as it pertained to Flemma.

**The Dissent**

**{45}** The dissent appears to misinterpret the majority opinion in two significant respects. First, the majority opinion is not about interpretation of a contract. It is about *evidence to prove* the formation of a contract. Second, the majority opinion does not rely only on Flemma's continuation of employment for its analysis of proof. Nor does the opinion rely on Flemma's continuation of employment as a substitute for proof of the formation of the contract. The evidence and proof consist of the mailings and the Secondment Agreement as detailed in the opinion together with Flemma's continued employment.

**{46}** Further, as we next discuss, a study of *DeArmond* shows that it does not control the present case and, aside from the fact that neither party cited to or relied on any Restatement of Contracts provision in their appellate briefs, as we also discuss here, we see nothing in the Restatement that requires a result different than that in the majority opinion.

**{47}** The Program provided for arbitration pursuant to the Federal Arbitration Act (FAA). The FAA is applicable to state courts. *DeArmond*, 2003-NMCA-148, ¶ 7. A principal purpose of the FAA is to require courts to compel arbitration where the parties agree to arbitrate. *Id*. It was "enacted to reverse the longstanding judicial hostility to arbitration agreements that had existed . . . and to place arbitration agreements upon the same footing as other contracts." *Id*. (internal quotation marks and citation omitted); *AT&T Mobility, LLC v. Conception*, 131 S. Ct. 1740, 1745 (2011) ("The FAA was enacted in 1925 in response to

14

widespread judicial hostility to arbitration agreements. . . . [C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms."). And the FAA constitutes a "declaration of a liberal federal policy favoring arbitration agreements." *DeArmond*, 2003-NMCA-148, ¶ 7 (alteration omitted) (internal quotation marks and citation omitted); *Conception*, 131 S. Ct. at 1745 ("We have described [Section 2, 'the primary substantive provision of the Act'] as reflecting . . . 'a liberal federal policy favoring arbitration[.]'"). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *DeArmond*, 2003-NMCA-148, ¶ 7 (alteration omitted) (internal quotation marks and citation omitted).

**{48}** We do not disagree with our statements in *DeArmond*, that "a legally enforceable contract is still a prerequisite for arbitration" and "[w]hether a valid contract to arbitrate exists is a question of state contract law." *Id.* ¶¶ 8-9. Nevertheless, in this case, applying conflict-of-laws rules, under Texas law and even under New Mexico law, there exists no defect in and the evidence supports the formation of the agreement. *DeArmond*, 2003-NMCA-148, ¶ 9 ("States may not subject an arbitration agreement to requirements that are more stringent than those governing the formation of other contracts."). Further, as pointed out in Justice Thomas's concurring opinion in *Conception*, the FAA does not contemplate public policy as a defense to the validity and enforcement of an arbitration agreement. *See Conception*, 131 S. Ct. at 1755 & n.* (Thomas, J., concurring) (interpreting Sections 2 and 4 of the FAA, and stating that "[c]ontract defenses unrelated to the making of the agreement —such as public policy—[cannot] be the basis for declining to enforce an arbitration clause"); *see also Conception*, 131 S. Ct. at 1748 ("Although [Section] 2's savings clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives.").

**{49}** The dissent's view that enforcement of the agreement would violate New Mexico public policy seems primarily driven by *DeArmond*. But even were a public policy defense permissible, New Mexico's general-contract law and conflict-of-laws rules do not support its application here. In *DeArmond*, the district court did not hold an evidentiary hearing, and it made no findings or conclusions. *Id.* ¶ 4. This Court remanded the case to the district court for Halliburton to prove that the plaintiff had actual knowledge of the offer made in a single, mailed notification to arbitrate and actual knowledge of Halliburton's invitation in that notification to accept the offer by continued employment. *Id.* ¶¶ 1, 23.

**{50}** Here, significantly different than in *DeArmond*, Halliburton presented substantial evidence to support its contention that Flemma certainly had constructive knowledge and must have had actual knowledge of the offer to arbitrate and of Halliburton's invitation to accept the offer by continued employment. Unlike the plaintiff in *DeArmond*, who may or may not have received the single, mailed notification, Halliburton presented undisputed proof here that (1) the documents were twice mailed to his home address and twice mailed to his office within Halliburton; (2) none were returned as undeliverable; (3) Flemma did not deny receiving the documents, claiming only that his wife may have thrown them away and that he did not "recall" seeing them; and (4) Flemma never affirmatively denied knowledge

15

of the Program or its terms.  Based on the evidence in this case, to hold that Flemma "was never aware of" the arbitration agreement is to turn a blind eye to the evidence.

**{51}**     In *DeArmond*, this Court stated that "we are unwilling under the facts of the case to equate presumed receipt with actual knowledge of the offer."  *Id.* ¶ 15.  But the Court carefully limited the breadth of the statement to "the facts of the case[.]" *Id.*  Underlying the *DeArmond* Court's remand was the dearth of evidence of the plaintiff's knowledge.  Here, not only did Halliburton present the unchallenged evidence we have discussed in regard to the four mailings, evidence going far beyond that in *DeArmond*, Flemma signed the Secondment Agreement.    That agreement indicated that Flemma was seconded by Halliburton to Halliburton International, Inc., for international assignments on the basis of the terms and conditions decided in the Secondment Agreement.  Among the terms and conditions was the following:

> Secondee understands and agrees to be bound by and accepts as a condition of Secondee's employment in the [U.S.] the terms of the . . . Program applicable to all employees from or working in the [U.S.], which is herein incorporated by reference. Secondee understands that the . . . Program requires, as its last step, binding Arbitration to resolve any and all claims or disputes.  Secondee understands that any and all claims or disputes that Secondee might have against [Halliburton] or its benefit plans for benefits or employment related matters including termination and/or any or all personal injury claims arising in the workplace but not already covered by workers compensation insurance, must be submitted to and are therefore subject to binding Arbitration instead of any local or federal court system in the [U.S.]

Explicit incorporation of the Program by reference as applicable "to all employees from or working in the [U.S.]" firmly placed Flemma on notice of the contents of the Program that had been and would be applicable to him while he worked in the United States.  Upon his return from his overseas assignment, Flemma continued working in the United States.  Application of general-contract law does not require a decision in this case that as a matter of law Halliburton failed to present sufficient evidence of Flemma's knowledge.

**{52}**     Further, and important, if not critical, is that *DeArmond* did not involve application of foreign law under conflict-of-laws rules.  *DeArmond* looked to general New Mexico contract law.  Application of the law to the particular facts of a case requires proof of facts relating to knowledge and awareness to prove the formation of a contract.  Texas and New Mexico require different proof requirements for contract formation when it comes to mailings under circumstances of at-will employment with an offer of arbitration and an employer's invitation for the employee to accept the invitation by continued employment.

**{53}**     It does not seem at all necessary to elevate the circumstances here to a level that overrides the priority of established conflict-of-laws rules just because the circumstances involve proof of the formation of a contract.  It seems more appropriate to settle here on the

stability of conflict-of-laws rules and analyses over the expansion of the concept of a public policy violation. There exists no New Mexico public policy that forbids the type of employer/at-will employee relationship together with the type of arbitration offer and acceptance at issue here. Texas law permits its formation based on evidentiary requirements different from those in *DeArmond*. What is the persuasive rationale supporting the view that circumstances of at-will employment arbitration selection over jury trial should override conflict-of-laws rules? The breadth of the district court's ruling seems to essentially move us back into the era of disfavoring arbitration.

**{54}** Nothing in *DeArmond* indicates that its evidentiary requirement cannot be proved by the circumstantial evidence presented in this case. Nothing in *DeArmond* indicates that we cannot, under well-established conflict-of-laws rules, turn to the law of Texas. And nothing in *DeArmond* indicates that its evidentiary requirements must, based on public policy, be applied instead of the different evidentiary requirements that are appropriately applied under established conflict-of-laws rules.

**{55}** Additionally, the dissent suggests that we should adopt the approach of the Restatement (Second) of Conflict of Laws that the dissent concludes favors New Mexico law. Even were we to apply a Restatement (Second) approach, we would hold that the law of Texas should be applied. First, with regard to the relevant policy of the forum, for reasons stated earlier in this response, we are not persuaded that our holding conflicts with the public policy concerns raised by *DeArmond*, nor do we find any persuasive justification for basing a holding on the premise that Flemma was not aware of his contractual agreement to arbitrate. Second, the justified expectations of both parties are at issue here. Based on the evidence discussed earlier, Halliburton's expectation of Flemma's acceptance of the terms of the Program was justified insofar as the formation of the contract conformed with Texas law. *See* Restatement (Second) of Conflict of Laws § 6, cmt. g (stating that "it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state"). Likewise, for the same reason, Flemma had an equally justifiable expectation that the agreement was enforceable. With regard to the basic policies underlying contract law, as indicated earlier in this response, we are not convinced that our holding in *DeArmond* would preclude a finding of mutual assent under the circumstances of this case where there was substantial undisputed proof of Flemma's receipt of the Program materials and his signature on the Secondment Agreement.

**{56}** Further, application of the contract-specific factors of the Restatement (Second) does not weigh in favor of the application of New Mexico law over that of Texas. First, Texas was the place of contracting. *See* Restatement (Second) of Conflict of Laws § 188, cmt. e (stating that "the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect"). As to the place of negotiation, because there was no negotiation, we determine that this factor is neutral. Lastly, we agree with the dissent that the place of performance and the location of the subject matter both weigh neutrally. *See id.* (stating that the place of performance bears

17

little weight in the choice-of-law analysis when, at the time of contracting, it is either uncertain or unknown; and also stating that the location of the subject matter of the contract is important when it deals with something in a fixed location). Of these factors, the single non-neutral factor, place of contracting, weighs in favor of applying Texas law. Thus, the Restatement (Second) of Conflict of Laws, far from militating in favor of the application of New Mexico law, supports our holding.

**CONCLUSION**

**{57}** We reverse the district court's denial of the motion to compel arbitration. On remand to the district court, Defendants' motion to compel arbitration should be granted.

**{58}** **IT IS SO ORDERED.**

_____

**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

**MICHAEL D. BUSTAMANTE, Judge (dissenting).**

**BUSTAMANTE, Judge (dissenting).**

**{59}** The majority decides the issue before us today based on its view that "the sole conflict between Texas and New Mexico law [at issue in this case] involves only evidentiary requirements of contract formation." Majority Op. ¶ 24. Unlike Texas, New Mexico requires proof of actual knowledge and conscious assent in order to change the terms of an at-will employment contract. *DeArmond*, 2003-NMCA-148, ¶¶ 18-20. Because I believe that this is not merely an evidentiary requirement, but instead a reflection of New Mexico public policy protecting workers from contractual obligations they are not aware of and to which they never agreed, I respectfully dissent.

**{60}** We have previously considered Halliburton's adoption of the Program. In *DeArmond*, a former employee sued Halliburton after he was discharged. Halliburton argued that it had mailed the details of the Program to the employee and that the mailing specified that continued employment constituted acceptance of the Program. Halliburton won its motion to compel arbitration. This Court reversed, noting that "a legally enforceable contract is still a prerequisite for arbitration." *Id.* ¶ 8. We reasoned that "the principle of conscious assent is particularly crucial in the at-will employment context, where acceptance may be manifested by continuing in a routine activity." *Id.* ¶ 18. If the employee did not have knowledge of the modified terms of employment, no new contract was formed. *Id.*

18

**{61}** *DeArmond* did not include a choice-of-law analysis, and we assume that the plaintiff in *DeArmond* lived in New Mexico when he received the mailing from Halliburton and that New Mexico law therefore applied. I agree with the majority that the application of Texas law would achieve a result opposite to the result we reached in *DeArmond*. The outcome in this case therefore depends on the choice of law.

**{62}** We review choice-of-law analyses de novo. *Nat'l Bank of Arizona*, 2005-NMCA-122, ¶ 7. "As a general proposition of law, it is settled that the validity of a contract must be determined by the law of the state in which it was made." *Boggs*, 72 N.M. at 140, 381 P.2d at 422. "To overcome the rule favoring the place where a contract is executed, there must be a countervailing interest that is fundamental and separate from general policies of contract interpretation." *Shope*, 1996-NMSC-052, ¶ 9. "Application of the rule must result in a violation of 'fundamental principles of justice' in order to apply New Mexico law rather than the law of the jurisdiction where the contract was signed." *Ballard*, 2002-NMSC-030, ¶ 9 (quoting *Shope*, 1996-NMSC-052, ¶ 7). "Simple differences in laws among states do not rise to this level." *Reagan*, 1997-NMCA-014, ¶ 15.

**{63}** In my view, the question of whether a contract was made is not merely a question of contract interpretation. It is a preliminary question that comes before interpretation. It goes to the very foundation of contract law: whether the circumstances are such that the mechanisms of the state may be invoked to enforce the terms of an agreement. In the context of the law of contracts, it is difficult to imagine a more fundamental principle of justice.

**{64}** New Mexico has a strong public policy in favor of the enforcement of contracts. In the context of at-will employment agreements, this has typically meant that an employee can accept a contract by continuing to work if he knew of the contract. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672, 857 P.2d 776, 783 (1993); *Stieber v. Journal Publ'g Co.*, 120 N.M. 270, 273, 901 P.2d 201, 204 (Ct. App. 1995). In those cases, it was the employee that sought to enforce the contract. This required the employee to show that the employer had made an offer and that the employee was aware of it. In contrast, in this case and in *DeArmond*, Halliburton sought to enforce a contract it had mailed to an employee. In *DeArmond*, we distinguished *Stieber* on the grounds that Halliburton had not shown that the employee was aware of the offer of changed conditions of employment. *DeArmond*, 2003-NMCA-148, ¶¶ 13-14. We noted that the problem could easily have been avoided by requiring a signature or other proof. *Id.* ¶ 14. Absent some indication that the employee was aware of the offer, however, we declined to conclude that simply continuing the "routine activity" of going to work was proof that the employee had consciously assented to the contract. *Id.* ¶ 18.

**{65}** Taking *DeArmond* one step further, I believe that a law allowing the continued routine activity of going to work to substitute for proof that an employee was aware of proposed changes to the terms of his employment is contrary to public policy. More specifically, the judicial enforcement of an agreement that an employee was never aware of exemplifies the "violation of fundamental principles of justice" and justifies the use of the

19

public-policy exception to the rule that we apply the law of the place where the contract was made. *Ballard*, 2002-NMSC-030, ¶ 9 (internal quotation marks and citation omitted). Freedom of contract necessarily implies freedom from obligations to which a party did not assent or was not even aware of.

**{66}** The application of New Mexico law also finds support in the Restatement (Second) of Conflict of Laws. New Mexico is one of only twelve states that still adheres to the older standard from the First Restatement that the validity of the contract is judged by the law of the place of contracting. *See* Hay, Borchers & Symeonides, *Conflict of Laws* § 18.21, at 1171-72 (5th ed. 2010). The Second Restatement adopted a different approach, weighing various factors when the parties or statutes do not dictate the choice of law. *See* Restatement (Second) of Conflict of Laws §§ 6, 188 (1971). In general, those factors include

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability[,] and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement § 6(2). For contracts, additional factors to consider include "(a) the place of contracting, (b) the place of negotiation of the contract, (C) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation[,] and place of business of the parties." Restatement § 188(2).

**{67}** I first look to the general factors of Section 6, *see* Restatement § 188(1), and concludes that these factors weigh in favor of the application of New Mexico law. The relevant policy of the forum, of course, is New Mexico's policy in favor of freedom to contract, which I have stated encompasses the freedom from obligations where no enforceable agreement exists. Similarly, absent assent, I believe Halliburton has no justified expectation that the contract is valid, and Flemma's justified expectation is that he is not subject to a contract he is not aware of. Similarly, the basic principles of contract law—that an agreement is not enforceable unless there is mutual assent—counsel in favor of application of New Mexico law in this case. I recognize that Texas law would indicate otherwise; however, I distinguish between matters of interpretation, in which deference should be accorded to Texas law, and matters of validity, in which, under the circumstances of this case, I believe it should not.

**{68}** The contract-specific factors from Section 188 of the Second Restatement also weigh in favor of the application of New Mexico law. Of these factors, the place of contracting, place of performance, and the location of the subject matter of the contract are neutral.

Halliburton mailed the proposed contract to Flemma in at least two states and appears to have sent it to its employees in every state in which they reside, including New Mexico. Furthermore, Flemma's duties were not restricted to Texas, but took him to various states. The place of negotiation weighs either neutrally or against Halliburton, as no negotiation took place. Flemma lived in New Mexico and worked at Halliburton's facilities in New Mexico when he was terminated. Both the general and contract-specific factors of the Second Restatement militate in favor of the application of New Mexico law.

{69} I do not mean to suggest that New Mexico's policy in favor of freedom of contract requires that New Mexico law should always apply to determine whether a contract was validly formed prior to enforcing that contract under the law of the state in which it was created. First, my reasoning is limited to the use of a presumption that continued employment, absent proof that an employee knew of a change in employment conditions, can raise a presumption of assent in the at-will employment context. Second, such a rule could encourage forum shopping, at least until employers adopted adequate procedures to show that employees were aware of contract changes. I believe the balancing approach of the Second Restatement avoids these problems. It would no doubt be easier to condone the application of Texas law had this case had a closer connection with Texas, for example, if Flemma had continued to live or work in Texas, or if the alleged tortious behavior took place in Texas. But here, where the alleged behavior took place in New Mexico, the result reached by the majority's application of the First Restatement's approach is inequitable and, in my view, against the public policy of New Mexico.

{70} Finally, I recognize that New Mexico has a strong policy in favor of arbitration. However, this policy is not implicated if no agreement to arbitrate exists. Because I believe that public policy precludes us from recognizing and enforcing the agreement at issue in this case, New Mexico's policy in favor of arbitration does not affect my analysis.

{71} For the foregoing reasons, I believe it is improper to apply the Texas case law creating a presumption that Flemma was aware of the contract. The majority having concluded otherwise, I respectfully dissent.

_____
**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *Flemma v. Halliburton Energy Services, Inc.*, No. 29,933**

**AE**          **APPEAL AND ERROR**
AE-SR          Standard of Review

**CP**          **CIVIL PROCEDURE**
CP-CL          Conflict of Laws

**CN**          **CONTRACTS**

| | |
|---|---|
| CN-CH | Choice of Law |
| CN-CO | Contracts Against Public Policy |
| CN-FC | Formation of Contract |
| CN-IN | Interpretation |
| CN-PP | Public Policy |
| | |
| **EL** | **EMPLOYMENT LAW** |
| EL-EA | Employment at Will |
| EL-EC | Employment Contract |
| EL-RT | Retaliatory Discharge |
| EL-TE | Termination of Employment |
| | |
| **JD** | **JURISDICTION** |
| JD-CL | Choice of Law |
| | |
| **RE** | **REMEDIES** |
| RE-AN | Arbitration |
| | |
| **TR** | **TORTS** |
| TR-WC | Wrongful Discharge |