## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2013-NMSC-022

Filing Date:  May 30, 2013

Docket No. 33,353

EDWARD R. FLEMMA,

     Plaintiff-Petitioner,

v.

HALLIBURTON ENERGY SERVICES, INC.,
RICK GRISINGER, RICHARD MONTMAN,
and KARL E. MADDEN,

     Defendants-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**
**James A. Hall, District Judge**

Guebert Bruckner, P.C.
Terry R. Guebert
Donald George Bruckner, Jr.
Albuquerque, NM

for Petitioner

Jackson Lewis, L.L.P.
Danny W. Jarrett
James L. Cook
Albuquerque, NM

Vinson & Elkins, L.L.P.
W. Carl Jordan
Corey E. Devine
Houston, TX

for Respondents

1

**OPINION**

**VIGIL, Justice.**

**{1}** This case presents a conflict of laws issue that requires us to determine whether enforcement of an arbitration agreement, formed in the State of Texas, would offend New Mexico public policy to overcome our traditional choice of law rule, which requires that we apply the law of the jurisdiction in which the contract was formed. We conclude that the agreement formed in Texas would be unconscionable under New Mexico law, and it therefore violates New Mexico public policy. Thus, we apply New Mexico law and conclude that no valid agreement to arbitrate exists between the parties because Halliburton's promise to arbitrate is illusory. Accordingly, we reverse the Court of Appeals and remand this case to the district court for further proceedings.

**I.     BACKGROUND**

**{2}** Defendant Halliburton Energy Services (Halliburton) hired Plaintiff Edward Flemma (Flemma) to work as a cement equipment operator in Houma, Louisiana, in January 1982. During his twenty-six years of employment with Halliburton, Flemma was promoted several times and worked for the company in Louisiana, Texas, Angola, and New Mexico. The last position he held was as district manager in Farmington, New Mexico, where he worked from 2006 until the time of his termination in 2008.

**{3}** As district manager, Flemma was involved in a company initiative to consolidate three Farmington facilities into one suitable facility. Halliburton considered two locations for the consolidated facility: Troy King, located within the Farmington city limits, and Crouch Mesa, located outside the city limits. The company preferred the Troy King location partly due to tax incentives offered by the city. Flemma opposed the Troy King facility for various reasons, including concerns about the safety of the general public.

**{4}** Flemma alleged that in August 2006, he and Defendant Karl Madden, a district sales manager for Halliburton, received a warning from Defendant Richard Montman, Flemma's supervisor, that "if you value your career, you will keep your mouth shut about the Troy King property." The day after this warning, Rick Grisinger, a Vice President of Halliburton, told Flemma to stop making "negative comments" regarding the Troy King location. Flemma did not heed Grisinger's warning, and in July 2007, Flemma continued to express his concerns when he prepared an executive summary comparing the two locations and reiterating the public safety issues at the Troy King location.

**{5}** In April 2008, Montman informed Flemma, "Today is your last day with the company, you are not meeting my expectations." Montman gave Flemma the option of signing a resignation, general release, and settlement agreement, as well as accepting twelve weeks of base salary, or being terminated. Flemma refused to sign the documents and was terminated. He stated in an affidavit that he was terminated in retaliation for "not keeping

2

[his] mouth shut" about his concerns related to the Troy King facility. As a result, Flemma filed a complaint in district court on December 22, 2008, against Halliburton and others for wrongful and retaliatory discharge.

**{6}** After answering Flemma's complaint, Halliburton filed a motion to compel arbitration, alleging that Flemma agreed to a binding arbitration provision in the company's Dispute Resolution Program (DRP), which was adopted in 1997. In support of its motion, Halliburton attached documentary evidence that on four separate occasions, Halliburton mailed Flemma materials notifying him that continued employment with the company constituted his acceptance of the terms of the DRP. According to Halliburton, the four mailings were essentially identical and expressly stated that continuing employment with Halliburton would constitute an agreement with Flemma to abide by the DRP.

**{7}** The first two alleged notifications occurred in December 1997 and spring 1998 while Flemma was working in Texas. The third alleged notification occurred in the summer of 1999 while Flemma was working in Louisiana. The fourth alleged notification occurred in October 2001 while Flemma was again working in Texas. Halliburton stated that it maintained a record of all the DRP-related mailings that were returned to Halliburton as undeliverable and none of the mailings sent to Flemma were returned as such. Thus, Halliburton alleged that Flemma must have received the mailings, which it asserted means that he was on notice that he agreed to arbitrate any employment-related disputes by continuing his employment.

**{8}** Flemma responded to Halliburton's motion to compel, arguing that he was not bound by the DRP's arbitration provisions pursuant to *DeArmond v. Halliburton Energy Services, Inc.*, 2003-NMCA-148, ¶ 14, 134 N.M. 630, 81 P.3d 573, which requires proof that an employee have actual knowledge of both the employer's offer and its invitation that the offer be accepted by performance. Flemma's affidavit stated that he did not remember seeing, receiving, opening, or reading the DRP material and that his ex-wife may have disposed of it. Flemma also argued that the DRP is invalid because Halliburton's promise to arbitrate is illusory, as it allows Halliburton to amend or terminate the DRP after a claim accrues.

**{9}** After briefing by the parties and a hearing, the district court denied Halliburton's motion to compel arbitration. The district court's order gave little explanation of its reasoning for the denial. However, during the hearing on the motion to compel, the district court gave two reasons for its ruling. First, the district court stated that the arbitration agreement was unenforceable because under New Mexico law it would be illusory, in that there cannot be a change to the arbitration agreement after a claim accrues. Second, the district court declined to apply Texas law on the basis that Texas law offends New Mexico public policy. The district court reasoned that enforcing an agreement solely on the basis of the mailings without affirmative evidence of acceptance or mutual assent would be contrary to public policy.

**{10}** After it failed to move the district court to reconsider its motion to compel arbitration,

Halliburton appealed the denial of its motion to the Court of Appeals. In a split decision, the Court of Appeals reversed the district court. The Court of Appeals framed the issue as "whether the district court correctly applied the public-policy exception in refusing to apply Texas law on the acceptance and assent issue when the sole conflict between Texas and New Mexico law involves only evidentiary requirements of contract formation." *Flemma v. Halliburton Energy Servs., Inc.*, 2012-NMCA-009, ¶ 24, 269 P.3d 931. Concluding that the agreement to arbitrate was enforceable under Texas law, the Court of Appeals reasoned that "[t]he mere differences between Texas and New Mexico in terms of the evidence required to prove acceptance of and assent to an agreement are not sufficient to overcome the place-of-formation rule on public-policy grounds." *Id.* ¶ 31. Judge Bustamante dissented, stating that the difference between Texas and New Mexico law is "not merely an evidentiary requirement, but instead a reflection of New Mexico public policy protecting workers from contractual obligations they are not aware of and to which they never agreed." *Id.* ¶ 59 (Bustamante, J., dissenting).

**{11}** Flemma appealed the Court of Appeals' opinion and argues that New Mexico's requirement of proof of actual knowledge and conscious assent is a reflection of public policy protecting workers from contractual obligations of which they are not aware and to which they never agreed. He also argues that Halliburton's ability to modify the terms of the arbitration agreement after a claim has accrued, but before an arbitration proceeding has been initiated, renders the arbitration agreement illusory and thereby unenforceable. We agree with Flemma on the latter, and thus, we decline to enforce the arbitration agreement under Texas law. Applying New Mexico law, we conclude that there is no valid agreement to arbitrate due to a lack of consideration since Halliburton's ability to revoke its promise to arbitrate after a claim has accrued makes the promise illusory.

## II.    DISCUSSION

**{12}** At the heart of this dispute is whether the parties have validly agreed to arbitrate Flemma's wrongful and retaliatory discharge claims. In order to determine whether such an agreement exists, we must navigate the arterial corridors of our conflict of laws rules, as well as our laws of contract formation. To determine which state's laws govern our inquiry, we employ a conflict of laws analysis. If the law of a foreign jurisdiction governs, then we look to whether its application would offend a tenet of New Mexico public policy. *United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 108 N.M. 467, 470, 775 P.2d 233, 236 (1989). If the application of the foreign law offends our public policy, we may apply New Mexico law. *Id.* In this case, the arbitration agreement was formed in Texas, where Flemma worked when the DRP was offered, and where Halliburton argues Flemma accepted its terms. Therefore, we analyze whether enforcing the agreement under Texas law would offend New Mexico public policy. Concluding that it does, we apply New Mexico law and conclude that no valid agreement to arbitrate exists.

## A.    STANDARD OF REVIEW

**{13}** This Court "appl[ies] a de novo standard of review to a district court's denial of a motion to compel arbitration." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901. Whether the parties have agreed to arbitrate is a question of law, which we review de novo. *Id.* Choice of law analyses are also reviewed de novo. *Ferrell v. Allstate Ins. Co.*, 2008-NMSC-042, ¶ 39, 144 N.M. 405, 188 P.3d 1156. "Where the issue to be determined rests upon interpretation of documentary evidence, this Court is in as good a position as the trial court to determine the facts and draw its own conclusions." *Verchinski v. Klein*, 105 N.M. 336, 338, 732 P.2d 863, 865 (1987).

## B. NEW MEXICO CHOICE OF LAW

**{14}** "As a general proposition of law, it is settled that the validity of a contract must be determined by the law of the state in which it was made." *Boggs v. Anderson*, 72 N.M. 136, 140, 381 P.2d 419, 422 (1963); *see also Wooley v. Shell Petroleum Corp.*, 39 N.M. 256, 262, 45 P.2d 927, 930 (1935) ("Generally, the validity of a contract is determinable by the law of the place of contracting."). Halliburton's DRP adopts the Federal Arbitration Act (FAA) as the applicable law. The FAA also defers to state law on the question of whether a contract exists. *Perry v. Thomas,* 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."); *see also DeArmond*, 2003-NMCA-148, ¶ 9. Therefore, the DRP's forum selection clause is not helpful to our determination of which state law to apply. New Mexico follows the Restatement (First) of Conflict of Laws when analyzing choice of law issues. *United Wholesale Liquor Co.*, 108 N.M. at 469, 775 P.2d at 235. According to the Restatement (First) of Conflict of Laws § 332(c) (1934), "The law of the place of contracting determines the validity and effect of a promise with respect to . . . consideration, if any, required to make a promise binding . . . ."

**{15}** Essentially, Halliburton has alleged that its DRP is a unilateral contract. "In a unilateral contract, the offeree accepts the offer by undertaking the requested performance." *Strata Prod. Co. v. Mercury Exploration Co.*, 1996-NMSC-016, ¶ 14, 121 N.M. 622, 916 P.2d 822. Therefore, Halliburton's mailing of the DRP materials constituted an offer, the terms of which Flemma allegedly accepted by continuing his employment with Halliburton. "In the case of an informal unilateral contract, the place of contracting is where the event takes place which makes the promise binding." Restatement (First) of Conflict of Laws § 323; *see also Walter E. Heller & Co. of Cal. v. Stephens*, 79 N.M. 74, 77, 439 P.2d 723, 726 (1968) (holding that where the last act necessary to make the lease agreement binding was performed in California, the lease agreement constituted a California contract).

**{16}** Under the Restatement (First) of Conflict of Laws, the event that would make the promise binding is Flemma's continued employment. Halliburton last sent notice of the DRP to Flemma when he was working in Texas in October 2001. Flemma stated that no DRP materials were sent to him while he was working in New Mexico. Therefore, Flemma's continued employment with Halliburton in Texas after it mailed the notice in October 2001 would have been the event that made Halliburton's DRP binding upon Flemma. Although

5

Flemma was working in New Mexico when he was terminated, "[w]here the offer invites acceptance through performance, rather than in writing, the *beginning* of invited performance is an implied acceptance." *DeArmond*, 2003-NMCA-148, ¶ 11 (emphasis added). In this case, the beginning of the invited performance occurred in Texas. Therefore, under our choice of law rule, the place of contracting was Texas, which means that Texas law should be used to determine whether a valid agreement to arbitrate exists.

**{17}** The Court of Appeals correctly concluded that under Texas law, an agreement to arbitrate existed between Halliburton and Flemma. *Flemma*, 2012-NMCA-009, ¶ 15. Because we agree with the Court of Appeals on this issue, we need not repeat its creditable analysis of Texas law here. Nevertheless, we may decline to enforce Texas law if it would violate New Mexico public policy, which is what the district court chose to do. The Court of Appeals reversed that decision, concluding that Texas law did not offend New Mexico public policy. We disagree.

## C. ENFORCING THE AGREEMENT UNDER TEXAS LAW VIOLATES NEW MEXICO PUBLIC POLICY

**{18}** "New Mexico . . . has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals." *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, ¶ 20, 134 N.M. 341, 76 P.3d 1098 (internal quotation marks and citation omitted); *see also Gen. Elec. Credit Corp. v. Tidenberg*, 78 N.M. 59, 62, 428 P.2d 33, 36 (1967) ("[P]ublic policy encourages freedom between competent parties of the right to contract, and requires the enforcement of contracts, unless they clearly contravene some positive law or rule of public morals."). "To overcome the rule favoring the place where a contract is executed, there must be a countervailing interest that is fundamental and separate from general policies of contract interpretation." *State Farm Mut. Auto. Ins. Co. v. Ballard*, 2002-NMSC-030, ¶ 9, 132 N.M. 696, 54 P.3d 357 (internal quotation marks and citation omitted).

**{19}** We conclude that enforcing the Texas agreement would violate New Mexico public policy because, under New Mexico law, the agreement is unconscionable. Unconscionability is a principle born of public policy, and it is a means of invalidating an otherwise valid contract. *See Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 43, 150 N.M. 398, 259 P.3d 803 ("Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." (internal quotation marks and citation omitted)). "Agreements to arbitrate may . . . be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* ¶ 17 (internal quotation marks and citation omitted); *see also AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, ___, 131 S. Ct. 1740, 1744 (2011) ("Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" (quoting 9 U.S.C. § 2 (2006)). A contract can be substantively unconscionable, procedurally

6

unconscionable, or both. *Rivera*, 2011-NMSC-033, ¶ 47. "Substantive unconscionability concerns the legality and fairness of the contract terms themselves." *Id.* ¶ 45 (internal quotation marks and citation omitted). "Contract provisions that unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 25.

**{20}** This Court has previously found various agreements to arbitrate unconscionable because they were unreasonably one-sided. In *Rivera*, 2011-NMSC-033, ¶¶ 53-54, we found arbitration provisions in car title loan contracts unreasonably one-sided and substantively unconscionable because they permitted the lender to seek judicial redress of its likeliest claims, such as foreclosure and repossession, while forcing the borrower to arbitrate any claim it might have. Similarly, in *Cordova*, 2009-NMSC-021, ¶¶ 26-27, 32, we found an arbitration provision in a loan agreement to be substantively unconscionable because it completely limited the borrower to mandatory arbitration as a forum to settle all disputes, while reserving for the lender the exclusive option of access to the courts for all remedies the lender was most likely to pursue against a borrower. The borrower had no rights under the provision "to go to any court for any reason whatsoever, including disputes about the validity of any of [the lender's] form loan or arbitration documents." *Id.* ¶ 27. In *Cordova* we also noted that the provision foreclosed claims that the lender was least likely to want to litigate. *Id.*

**{21}** Courts in other jurisdictions have similarly found arbitration agreements unconscionable because they were unreasonably one-sided in favor of the employer. For instance, in *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254 (9th Cir. 2005), the court found an arbitration agreement to be unconscionable for several reasons, including that the employer retained the right to unilaterally amend or terminate the agreement. *Id.* at 1261-62. In so holding, the court cited to its earlier decision in *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003). *Al-Safin*, 394 F.3d at 1261-62. The *Ingle* court also found Circuit City's authority to unilaterally amend or terminate an arbitration agreement unconscionable. 328 F.3d at 1179. The court reasoned:

> Although the agreement requires Circuit City to provide exiguous notice to its employees of termination or any modification, such notice is trivial when there is no meaningful opportunity to negotiate the terms of the agreement. By granting itself the sole authority to amend or terminate the arbitration agreement, Circuit City proscribes an employee's ability to consider and negotiate the terms of her contract. Compounded by the fact that this contract is adhesive in the first instance, this provision embeds its adhesiveness by allowing only Circuit City to modify or terminate the terms of the agreement. Therefore, we conclude that the provision affording Circuit City the unilateral power to terminate or modify the contract is substantively unconscionable.

*Id.* (footnotes omitted). A similar rationale was also employed by the Supreme Court of Appeals of West Virginia to find an arbitration agreement unconscionable. *State ex rel.*

7

*Saylor v. Wilkes*, 613 S.E.2d 914, 922 (W. Va. 2005).

**{22}** In *Wilkes*, 613 S.E.2d at 922, the court evaluated an arbitration agreement between an employee and a third party retained by the employer to handle all employment-related disputes. The court held the arbitration agreement to be unconscionable for several reasons, including on the grounds that the third party retained the right to unilaterally amend or terminate the agreement. *Id*. It opined, "The terms of Petitioner's Agreement were not negotiable and clearly weighed in favor of EDSI [Employment Dispute Services, Inc.] and the companies with whom EDSI contracted to provide arbitration services. EDSI retained the right to unilaterally modify rules governing arbitration without input or notice to Petitioner before, during or after amendments are made." *Id*. The same rationale applies to the agreement at issue here.

**{23}** In this case, we find the arbitration agreement to be substantively unconscionable because it is unreasonably one-sided in that it favors Halliburton in the employment dispute. The relevant provisions of the agreement read as follows:

> 6.  Amendment
>
> A. This Plan may be amended by [Halliburton] at any time by giving at least 10 days notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules.
>
> B. [Halliburton] may amend the Rules at any time . . . . However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules.
>
> 7.  Termination
>
> This Plan may be terminated by [Halliburton] at any time by giving at least 10 days notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination.

**{24}** While these terms do not distinguish the method of each party's redress, as did the agreements in *Cordova* and *Rivera*, this agreement allows Halliburton to amend its terms even after a claim accrues and before any proceeding is initiated. In effect, Halliburton could change the rules of the game just before it starts. For example, an employee who has been terminated may later find out, prior to initiating a case, that the terms of arbitration have become more restrictive. Halliburton can do this at any time and only give notice to current employees. Therefore, the employees most likely to use the DRP, i.e., terminated

8

employees, would not even get notice of changes to the DRP, which could negatively affect their claims.

**{25}** For these reasons, the DRP is unconscionable, and enforcing it would offend our public policy. Accordingly, we decline to enforce the agreement under Texas law, and we analyze whether a valid agreement to arbitrate exists under New Mexico law.

## D. A VALID AGREEMENT TO ARBITRATE WAS NOT FORMED UNDER NEW MEXICO LAW

**{26}** Applying New Mexico law to the alleged agreement, we conclude that Flemma and Halliburton never formed a valid agreement to arbitrate because the agreement fails for lack of consideration. It fails because Halliburton's promise to arbitrate is illusory since Halliburton retains the right to unilaterally amend the agreement's terms after an employee's claim has accrued.

**{27}** There is no dispute that Halliburton made an offer to arbitrate. However, the facts of the case do not support the conclusion that it gave valid consideration for Flemma's promise to arbitrate. Halliburton argues that in exchange for Flemma's promise to arbitrate his claims, it promised to arbitrate its claims, and that these mutual promises are consideration to support enforcement of the arbitration agreement. We disagree. Because the terms of the agreement allow Halliburton to amend the agreement *after* a claim has accrued, but *before* arbitration proceedings are initiated, Halliburton can decide that it does not want to use alternative dispute resolution, or it may alter the terms on which alternative dispute resolution is based.

**{28}** The existence of a valid agreement to arbitrate is required to compel arbitration. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (holding that the existence of a valid agreement to arbitrate is also a prerequisite to compelling arbitration under the FAA); *see also McMillan v. Allstate Indem. Co.*, 2004-NMSC-002, ¶ 8, 135 N.M. 17, 84 P.3d 65 (explaining that New Mexico's Uniform Arbitration Act does not permit a court to grant a motion to compel arbitration where no agreement to arbitrate exists). "Whether a valid contract to arbitrate exists is a question of state contract law." *DeArmond*, 2003-NMCA-148, ¶ 9 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)). For a contract to be legally valid and enforceable, it "must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 121 N.M. 728, 918 P.2d 7 (internal quotation marks and citation omitted). The burden of proof is on the party asserting that a valid contract exists. *See Camino Real Mobile Home Park P'ship v. Wolfe*, 119 N.M. 436, 442, 891 P.2d 1190, 1196 (1995) ("The plaintiff's burden of proof in an action for breach of warranty thus is identical to the burden of proof in any action for breach of contract. The party relying on the breach of warranty must prove the existence of a warranty, the breach thereof, causation, and damages"), *overruled on other grounds by Sunnyland Farms, Inc. v. Central N.M. Elec. Co-op, Inc.*, 2013-NMSC-017, ¶¶ 11, 14-16,

9

___ P.3d ___ .

**{29}** A promise is illusory if it consists of "words in promissory form that promise nothing." 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* § 5.28 at 142 (rev. ed. 1995). According to the Restatement (Second) of Contracts § 77 (1981), "A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances . . . ." A party's promise to arbitrate is also illusory where it retains the ability to unilaterally change the arbitration agreement. *See id*. cmt. a ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("[A]n arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *Salazar v. Citadel Commc'ns Corp.*, 2004-NMSC-013, ¶ 9, 135 N.M. 447, 90 P.3d 466 ("Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable."); *Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶¶ 11-12, 134 N.M. 558, 80 P.3d 45 (same).

**{30}** The district court stated that Flemma's case "[fell] nicely" between the cases of *Salazar*, 2004-NMSC-0013, and *Sisneros v. Citadel Broad. Co.*, 2006-NMCA-102, 140 N.M. 266, 142 P.3d 34. In *Salazar*, this Court ruled that an arbitration agreement annexed to an employment agreement was unenforceable. 2004-NMSC-013, ¶ 11. The Court found that the policy gave the employer the unrestricted right to amend or terminate its agreement to arbitrate disputes at any time, thereby making it unenforceable. *Id.* ¶ 9.

**{31}** The Court of Appeals distinguished *Salazar* in *Sisneros*. The arbitration agreement at issue in *Sisneros* restricted the employer's right to terminate or amend the agreement to arbitrate. 2006-NMCA-102, ¶ 33. "[A]ny termination or amendment [would] not apply to claims which accrued before the amendment or termination." *Id.* (added emphasis omitted) (internal quotation marks and citation omitted). Therefore, once a claim accrued, the employer and employee were bound to arbitrate the dispute under the rules that applied when the claim accrued. *Id*.

**{32}** The reason that this case falls between *Salazar* and *Sisneros* is that, as the district court found, the arbitration agreement leaves a period of time between when a claim accrues and when a proceeding is initiated, during which Halliburton retains the authority to unilaterally amend the agreement. A claim for common law tort arising from employment termination accrues when an employee's job is terminated. *Id.* ¶ 34. According to the October 2001 agreement sent to Flemma, "[N]o amendment shall apply to a Dispute for which a proceeding has been *initiated* pursuant to the Rules." (Emphasis added.) In *Salazar*, the employer retained authority to amend the agreement throughout. 2004-NMSC-013, ¶ 11. In *Sisneros*, the employer could not amend the agreement after a claim accrued, i.e., after a termination. 2006-NMCA-102, ¶ 33. Halliburton's agreement only partially fixes the deficiencies highlighted by *Salazar* by providing that no amendment can be made after arbitration proceedings are initiated, but it fails to meet the requirement set by *Sisneros*.

10

**{33}** Halliburton's DRP is contrary to *Sisneros* because it can amend the DRP *after* a claim accrues. In addition, Halliburton retains sole discretion to revoke the DRP at any time. Although Halliburton cannot modify the DRP unless it gives advance notice to current employees, terminated employees such as Flemma would not receive advance notice of changes to the agreement. Therefore, Halliburton's DRP is illusory because it retains the authority to unilaterally amend the agreement even after a claim accrues.

## III. CONCLUSION

**{34}** We conclude that the district court did not err in refusing to compel arbitration in this case. Flemma and Halliburton did form a valid agreement to arbitrate in the State of Texas, and under our traditional conflict of laws rule, we would apply Texas law to determine whether the agreement compels arbitration. However, the agreement would be unconscionable under principles of New Mexico law, and enforcing it would violate our public policy. As such, we invoke the public policy exception to the conflict of laws rule and apply New Mexico law in this case.

**{35}** Under New Mexico law, we conclude that no valid agreement to arbitrate exists, as the agreement lacks consideration because Halliburton can unilaterally amend or revoke its promise to arbitrate after a claim has accrued. In the context of this case, we must ensure that the employee, who has apparently agreed to arbitrate employment-related disputes, has received consideration for this promise. This is particularly crucial where the employer's authority to terminate employment is the cause for the need for dispute resolution. Here, Halliburton made what appears to be a return promise to arbitrate, but a closer evaluation of its promise reveals that it only created the illusion of such a promise because it could amend the DRP or do away with it all together after Flemma's claim accrued. This type of illusory promise is insufficient consideration for Flemma's promise to arbitrate employment-related disputes, and it is patently unfair in the context of the imbalanced at-will employee-employer relationship.

**{36}** Accordingly, we reverse the Court of Appeals and affirm the district court's denial of the motion to compel arbitration. We remand this matter to the district court for further proceedings on Flemma's employment claims.

**{37}** **IT IS SO ORDERED**.

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**

**Topic Index for *Flemma v. Halliburton Energy Servs., Inc.*, No. 33,353**

**APPEAL AND ERROR**
Standard of Review

**CIVIL PROCEDURE**
Conflict of Laws

**CONTRACTS**
Choice of Law
Contracts Against Public Policy
Formation of Contract
Interpretation
Public Policy

**EMPLOYMENT LAW**
Employment at Will
Employment Contract
Retaliatory Discharge
Termination of Employment

**JURISDICTION**
Choice of Law

**REMEDIES**
Arbitration

**TORTS**
Wrongful Discharge