IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: April 20, 2016

**NO. 33,781**

**AMERICAN CIVIL LIBERTIES UNION
OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**DIANNA J. DURAN,**

Defendant-Appellant,

and

**CHRISTIANA SANCHEZ,**

Defendant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Clay Campbell, District Judge**

ACLU of NM Foundation
Alexandra Freedman Smith
Albuquerque, NM

Law Office of Philip B. Davis
Philip B. Davis
Albuquerque, NM

for Appellee

Hector H. Balderas, Attorney General
Santa Fe, NM

Fuqua Law & Policy, P.C.
Scott Fuqua, Special Assistant Attorney General
Santa Fe, NM

for Appellant

**OPINION**

**WECHSLER, Judge.**

{1} This case presents yet another opportunity to interpret provisions of our Inspection of Public Records Act—this time with respect to the district court's award of attorney fees.

{2} Appellant, former Secretary of State Dianna Duran, appeals the district court's order granting attorney fees.[1] Appellant's primary argument is premised upon her assertion that the final responsive records to Appellee American Civil Liberties Union of New Mexico's public records request were produced on May 25, 2012. Taking this assertion as true, Appellant argues that her production of any records after May 25, 2012 could not form the basis of "successful" litigation under the statute either because (1) the subsequently produced records were non-responsive or (2) Appellee already possessed the records at the time of production. In a related claim, Appellant argues that the district court's award of attorney fees accrued after May 25, 2012 was not "reasonable" as that word is used in the statute because Appellee's sole purpose

---

[1] In the district court, this case was captioned American Civil Liberties Union of New Mexico v. Dianna J. Duran and Christiana Sanchez. Sanchez is not a party to this appeal. When appropriate, we refer to Duran and Sanchez collectively as Defendants.

in continuing the litigation beyond that date was to investigate the validity of Defendants' claim that they possessed no additional responsive records.

{3} We conclude that Appellant violated the Inspection of Public Records Act by withholding responsive records until the last of those records were produced on June 5, 2013. Because additional responsive records that were previously withheld were produced during the pendency of the litigation, Appellee's litigation was "successful" as that word is used in the statute. For the same reason, and for additional reasons related to Defendants' conduct as discussed below, the district court's grant of attorney fees was also "reasonable."

{4} Appellant's secondary argument is that the nature of Appellee's settlement offer rendered the accrual of any post-settlement-offer attorney fees unreasonable under the statute. Because this argument is also unsupported by New Mexico law, we affirm.

**BACKGROUND**

{5} On March 15, 2011, the New Mexico Secretary of State's Office announced that an internal investigation had revealed one hundred seventeen instances in which foreign nationals registered to vote in New Mexico and that, in thirty-seven of those instances, the illegal registrants had actually voted in New Mexico elections. In response to this statement, Appellee filed a request with the Secretary of State's

Office, pursuant to the Inspection of Public Records Act (IPRA), NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 2013), requesting production of all public records that supported the allegations. The same day, Appellee filed a similar IPRA request with the Governor's Office.

{6} The Governor's Office produced various public records relevant to this litigation in response to Appellee's IPRA request. Among these records was an email thread (the Colorado emails) dated March 8, 2011 to March 9, 2011. The Colorado emails began with an email from the Colorado Department of State that was forwarded to the Secretary of State's Office Bureau of Elections Director, Bobbi Shearer, and continued as a discussion between Shearer and the Director of Policy and Planning for the Governor's Office, Matt Kennicott. The emails between Shearer and Kennicott discussed a proposed database cross-check between the Secretary of State's Office and the Motor Vehicle Division of the Department of Taxation and Revenue (MVD) for the purpose of determining whether non-citizens were registered to vote in New Mexico.

{7} On March 31, 2011, Defendants formally responded to Appellee's IPRA request. Defendants did not produce the Colorado emails but did produce twelve redacted emails and one letter addressed to a New Mexico assistant attorney general. Additionally, Defendants described certain responsive records that were being

withheld under IPRA disclosure exceptions. Defendants did not disclose the existence, or justify the withholding, of the Colorado emails but instead specifically stated "[t]he Secretary of State's Office does not possess any [responsive] documents that reflect communications between the Office of the Secretary of State and the Governor's Office[.]"

{8} On April 11, 2011, Appellee sent a second IPRA request to the Secretary of State's Office. This letter supplemented Appellee's original IPRA request with requests for the production of additional records. Defendants produced no additional records in response to Appellee's supplemental request.

{9} On July 20, 2011, Appellee filed this lawsuit to force the production of public records allegedly withheld in violation of IPRA. In its complaint, Appellee alleged that the Colorado emails provided the impetus for the Secretary of State's Office investigation into whether non-citizens were illegally registered to vote in New Mexico. The complaint disputes Defendants' denial of the existence of responsive communications between the Secretary of State's Office and the Governor's Office by reference to the Colorado emails.

{10} In their answer, Defendants acknowledged the existence of, and confirmed certain content within, the Colorado emails. During the discovery process, Defendants produced additional records, including spreadsheets used by the Secretary

4

of State's Office in its review of New Mexico's voter registration file and voter registration cards for one hundred fifteen of the one hundred seventeen individuals that the investigation identified as registered voters despite not being New Mexico residents.

{11} On October 20, 2011, Defendants provided a privilege log that outlined certain documents withheld from production, including: (1) a list of one hundred seventeen names that appeared in both the Secretary of State's voter file and the MVD foreign national database (list of 117), and (2) a list of thirty-seven names of registered voters who may not be New Mexico citizens but appear to have voted in a New Mexico election (list of 37).

{12} On January 12, 2012, Appellee filed a motion for summary judgment, requesting that the district court order production of the two lists, as well as all other records responsive to its IPRA requests. The lists then became the subject of an email exchange between the parties. On February 6, 2012, Appellee sent a letter to Defendants outlining its understanding as to the existence of the two lists. On February 13, 2012, Defendants responded with a letter intended to clarify "confusion about the state of the documents at issue." As clarification, the letter stated, "[w]hen I say that the Secretary of State's Office did not create such lists, what I mean is that

such lists do not physically exist. . . . In identifying those voters, the Secretary of State did not generate any document separately listing them."

{13}    The next day, Appellee responded with a letter stating, "[g]iven the confusion surrounding the public records, [Appellee] feel[s] that it is necessary to depose [Appellant] in order to obtain her responses under oath." Appellee then filed notice to conduct an in-person deposition of Appellant.

{14}    On March 2, 2012, Defendants filed their response to Appellee's motion for summary judgment. The response stated that (1) the list of 37 does not exist, (2) the list of 117 would be produced upon issuance of a district court order clarifying non-liability under state law, and (3) "[t]he Secretary either has already produced or will immediately produce" all other responsive documents. Attached to Defendants' response was an affidavit of the Secretary of State's Office Chief of Staff, Kenneth Ortiz. The affidavit outlined the investigative procedure leading to the March 15, 2011 announcement and described the generation of the list of 117. The affidavit additionally stated that a physical copy of the list of 37 was never generated.

{15}    On March 6, 2012, Defendants filed a motion for protective order to prevent Appellee from conducting an in-person deposition of Appellant. In support of the motion, Defendants argued that Appellant had no personal knowledge of the investigative process or documents at issue. Appellee filed a response outlining

Defendants' confusion as to the existence of the list of 117 and the list of 37, as well as motions to depose Ortiz and Shearer. Appellee specifically noted,

> Given the wildly conflicting accounts of the documents which may or may not exist . . . [Appellee] must depose [Appellant] to ascertain whether there is, in fact, a list of thirty seven people who allegedly voted illegally, and whether there are additional documents that are responsive to [Appellee's] IPRA requests that have not been produced. Given the multiple inconsistent and contradictory claims as to whether these documents exist at all, it is unreasonable to expect [Appellee] to rely on representations made by counsel instead of obtaining sworn statements.

Shearer's deposition was conducted on May 4, 2012. During this deposition, Shearer was presented with the Colorado emails, which she authenticated.[2]

{16} The district court entered a stipulated order of partial summary judgment as to the list of 117. In doing so, the court noted that the "remaining issues and requests for relief . . . are not affected by this [s]tipulation and remain pending." The list of 117 was produced on May 25, 2012.

{17} In June 2012, reports circulated indicating that executive branch employees were using private or personal email accounts to conduct state business. *See* Dan Boyd, *Private Email Flap Grows*, *Albuquerque Journal*, June 16, 2012,

---

[2]The pages of deposition testimony in which Shearer authenticates the Colorado emails are not included in the record proper. However, the parties agree that the authentication occurred.

http://www.abqjournal.com/113169/news/private-email-flap-grows.html. Following these reports, Appellee requested production of all emails sent to or from private email accounts that were responsive to its IPRA requests. No responsive emails were produced in response to Appellee's request. On June 25, 2012, Appellee filed a motion to compel production of all responsive public records, including any emails sent to or from private email accounts. Defendants responded, arguing that Appellee lacked good faith to allege such emails existed and denying that any responsive emails exist. The district court granted Appellee's motion, ordering:

> 1. Defendants are *ordered to produce all [e]mails pertaining to the matters described in the two IPRA requests in this case*, including all [e]mails sent to and/or copied to and/or received by [Appellant] on private and personal email accounts.
>
> 2. Within 15 days after the entry of this [o]rder, *[Appellant] shall submit a sworn [a]ffidavit to [Appellee] verifying that all [e]mails pertaining to the matters described in the two IPRA requests in this case*, including emails sent and received on private and personal email accounts *have been produced*. If there are no [e]mails pertaining to the matters described in the two IPRA requests in this case that were sent to and/or copied to and/or received by [Appellant] on private and personal email accounts, she shall so state.

(Emphasis added.) On the same day, the district court granted Defendants' motion for protective order, prohibiting Appellee from conducting an in-person deposition of Appellant. In lieu of an in-person deposition, Appellee was granted permission to

8

conduct a deposition on written questions. Appellee submitted one hundred eighty-eight deposition questions to be answered by Appellant.

{18}    In response to the district court's order, on August 24, 2012, Appellant submitted an affidavit stating, in pertinent part,

> 3.   I did not use any personal or private email account to communicate to anyone any information related to the March 2011 investigation conducted by my [o]ffice with respect to the two IPRA requests in this case.
>
> 4.   *There are no emails sent to and/or received or copied to and/or received by me* on private or personal email accounts *pertaining to the matters described in the two IPRA requests in this case.*

(Emphasis added.) Defendants then filed a second motion for a protective order seeking protection from one hundred fifty-seven of the one hundred eighty-eight deposition questions submitted by Appellee. By way of background in their motion, Defendants outlined the various public records produced to date and stated "the Secretary of State's Office has produced all of the documents in its possession, custody, or control responsive to [Appellee's] requests." Appellee submitted a response in opposition that detailed Defendants' "[h]istory of [n]on-[d]isclosure in the [l]itigation[.]" The Colorado emails featured prominently in this argument.

{19}    On October 18, 2012, Appellee filed a motion for finding of contempt, claiming that Appellant's August 24, 2012 affidavit was non-responsive to the court's

9

order in that it failed to "verify" that all responsive emails had been produced. The motion specifically noted that "[t]he failure of the [Secretary of State] to produce [the Colorado emails] . . . casts doubt over Defendants' repeated representation that all records responsive to [Appellee's] IPRA requests have been produced." Appellee filed a second motion to conduct an in-person deposition of Appellant, stating that Appellant "has shown through her refusal to answer [one hundred fifty-seven out of one hundred eighty-eight] deposition questions that she holds an unnecessarily narrow interpretation of what documents are responsive to [Appellee's] IPRA requests[.]"

{20}     On November 5, 2012, Defendants filed a response to Appellee's motion for contempt. As a basis for their opposition, Defendants argued that (1) IPRA did not require production of the Colorado emails because Appellee already possessed the Colorado emails, and, in the alternative, (2) IPRA did not require production of the Colorado emails because they were non-responsive. Defendants did not produce the Colorado emails at this time.

{21}     Following the filing of additional responses and replies, the district court held a hearing on Appellee's motion to compel on January 7, 2013. During the hearing, Appellee highlighted the confusion surrounding the existence and production of the list of 117 and the list of 37. Appellee then argued that Defendants' failure to provide

all responsive documents or to comply with the court's order compelling production justified the continuing litigation. Defendants argued at length that the Colorado emails are non-responsive to Appellee's IPRA requests, and, therefore, were not subject to the court's order. The district court denied Appellee's motion, but made the following comments:

> [W]hat I definitely remember saying to [counsel for Defendants] was [that] your client is begging to be deposed. So I assumed that that statement is why I have a couple of pending motions to depose your client, in addition to everything else. Because your client is being asked very direct questions, and your client appears to be answering the questions that she wants to answer or having people answer questions that she wants to have them answer[] and not fully answering the questions. So I mean, I can appreciate where the [Appellee's] anxiety comes from.

The court entered a second order requiring that Appellant "shall submit a sworn affidavit to [Appellee] verifying that all emails pertaining to the matters described in the two IPRA requests . . . have been produced." The court also issued orders denying Appellee's motion to conduct an in-person deposition of Appellant and granting in part Defendants' second motion for a protective order. Appellant was required to answer one hundred forty-five of the proposed one hundred eighty-eight deposition questions.

{22}    Appellant's deposition on written questions was conducted on April 30, 2013. Following the deposition, Defendants contacted Appellee by email to determine

11

whether unresolved issues remained. Appellee responded that materials responsive to its IPRA requests, specifically the Colorado emails, remained unproduced. Defendants ultimately produced the Colorado emails on May 23, 2013 and attachments thereto on June 5, 2013. The district court granted a stipulated dismissal, except as to attorney fees, costs, and expenses, on September 3, 2013.

{23} The district court heard arguments related to Appellee's fee motion on March 12, 2014. At this hearing, and in its subsequent order, the district court found that "counsel's hours spent in this case for which [Appellee] seeks compensation were all reasonable and necessary to [Appellee's] successful prosecution of this IPRA lawsuit." Attorney fees were granted for the work of merits counsel in the amount of $71,239.50. Attorney fees were granted for the work of fee counsel in the amount of $15,729.00. This appeal resulted.

**STANDARD OF REVIEW**

{24} Appellate courts review an award of attorney fees for abuse of discretion. *Lebeck v. Lebeck*, 1994-NMCA-103, ¶ 27, 118 N.M. 367, 881 P.2d 727. A district court abuses its discretion when "a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. To the extent that Appellant's arguments

require statutory interpretation, we apply de novo review. *State v. DeAngelo M.*, 2015-NMSC-033, ¶ 7, 360 P.3d 1151.

**RESPONSIVENESS OF PUBLIC RECORDS IN IPRA LITIGATION**

{25}    Section 14-2-1(A) of IPRA provides that "[e]very person has a right to inspect public records" unless a specified exception precludes disclosure. IPRA's purpose—to promote the existence of (1) an informed electorate and (2) transparency in governmental affairs—is documented in the legislation itself and in our appellate case law. *See* § 14-2-5 ("Recognizing that a representative government is dependent upon an informed electorate, the intent of the [L]egislature in enacting [IPRA] is to ensure, and it is declared to be the public policy of this state, that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees."); *San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 16, 150 N.M. 64, 257 P.3d 884 ("IPRA is intended to ensure that the public servants of New Mexico remain accountable to the people they serve."); *State ex rel. Newsome v. Alarid*, 1977-NMSC-076, ¶ 34, 90 N.M. 790, 568 P.2d 1236 ("The citizen's right to know is the rule and secrecy is the exception."), *superseded on other grounds by statute as stated in Republican Party of N.M. v. N.M. Taxation & Revenue Dep't*, 2012-NMSC-026, ¶¶ 14-16, 283 P.3d 853.

{26} To initiate a public records request, any person may contact the records custodian at the desired governmental entity and "identify the records sought with reasonable particularity." Section 14-2-8(C). Email correspondence by state employees constitutes a public record as defined in the statute. *See* § 14-2-6(G).

{27} Appellant's argument in this case hinges, in substantial part, on whether the Colorado emails are responsive to Appellee's IPRA request. While the term "responsive" is appropriately used by litigants to describe the nature of public records, it does not appear in the statute. *See* §§ 14-2-1 to -12. To determine whether a public record is "responsive," courts must evaluate whether the IPRA request identified the record "with reasonable particularity." Section 14-2-8(C).

{28} The Colorado emails began with an email from Judd Choate, Director of the Colorado Division of Elections. Choate's email was addressed to the National Association of State Election Directors (NASED). The email stated, in pertinent part,

> At 1pm this afternoon . . . Colorado Secretary of State Scott Gessler will hold a news conference to discuss legislation under consideration in the Colorado House that would allow the Colorado Department of State to spot check and investigate voter registrations for the possibility that non-citizens are 1) currently registered to vote, 2) are being accidentally registered to vote, or 3) are willfully seeking to register in violation of both state and potentially federal law.
>
> Simultaneous with this press conference, the Department of State will issue a report outlining the research we have undertaken to determine the number of persons currently registered who may not be U.S. citizens. In short, that research has found that there are certainly hundreds, and

14

likely thousands, of non-citizens who are registered to vote in the state of Colorado.

I wanted to warn you that this report will be issued in case it becomes a national story requiring that you address the issue relative to your state.

Choate's email was forwarded by NASED personnel to Shearer. Shearer forwarded Choate's email to Kennicott with comments stating, "Colorado is going to announce this today. We do already have an agreement in place [between the Secretary of State's Office], [MVD], and [S]ocial [S]ecurity to cross-check. If MVD would do it, we could run a cross-check this week. What do you think? Tell MVD to coordinate with us?" Shearer and Kennicott then exchanged emails discussing implementation of a cross-check of the Secretary of State's Office and MVD databases.

{29}     Following the March 15, 2011 announcement, Appellee submitted two separate IPRA requests: one on March 16, 2011 and another on April 11, 2011. In these requests, Appellee requested nine types of documents related to the Secretary of State's Office investigation into potential voter fraud in New Mexico. One of the requests included "[a]ny documents that reflect communications between the Office of the Secretary of State and any one at the Governor's Office related to alleged and/or proven voter fraud involving foreign nationals and/or any irregularities noted in the master list of registered voters in New Mexico."

15

{30}     While Appellee's request is somewhat unwieldy as written, it can be deconstructed using basic grammar. The use of "and/or" within the request indicates that the request contemplates both conjunctive and disjunctive readings. Because the request uses "and/or" twice, numerous possible readings are included within the request, including, "Any documents that reflect communications between the Office of the Secretary of State and any one at the Governor's Office related to alleged *or* proven voter fraud involving foreign nationals *or* any irregularities in the master list of registered voters in New Mexico." Since a disjunctive reading anticipates removal of the content following the word "or," another grammatically correct reading is, "Any documents that reflect communications between the Office of the Secretary of State and any one at the Governor's Office related to alleged voter fraud involving foreign nationals."

{31}     The subject matter of Choate's email to NASED was alleged voter fraud involving foreign nationals. Choate's email was forwarded between personnel in the Secretary of State's Office and the Governor's Office. Appellant argues on appeal that the Colorado emails are not responsive because they do not contain allegations of voter fraud in New Mexico. This argument is misplaced given the construction of the request. Appellee's IPRA request was crafted "with reasonable particularity" to make the Colorado emails responsive to the request. Section 14-2-8(C).

16

**SUCCESS IN IPRA LITIGATION**

{32}    IPRA's enforcement provision provides that "[t]he court shall award damages, costs and reasonable attorney[] fees to any person whose written request has been denied and is *successful* in a court action to enforce the provisions of [IPRA]." Section 14-2-12(D) (emphasis added). Appellant argues that Appellee is not entitled to an award of attorney fees accrued after May 25, 2012 because Appellee's IPRA litigation after May 25, 2012 was not "successful" as that word is used in IPRA. As a basis for this argument, Appellant claims that no responsive documents were produced after May 25, 2012. As discussed immediately above, this argument fails because the Colorado emails, produced by Defendants on May 23, 2013 and June 5, 2013, were responsive to Appellee's IPRA request.

{33}    Alternatively, Appellant argues that production of the Colorado emails cannot constitute success under IPRA because Appellee already had possession of the Colorado emails at the time litigation was filed, and, as a result, Defendants did not withhold or deny Appellee access to the records. To determine whether IPRA litigation that results in the production of responsive records already in a litigant's possession is "successful" as that word is used in IPRA, we apply principles of statutory construction.

17

{34} Because the word "successful" is not defined, we must determine its meaning in the context of the statute. An appellate court's "primary purpose in interpreting a statute is to ascertain and give effect to legislative intent." *Maes v. Audubon Indem. Ins. Grp.*, 2007-NMSC-046, ¶ 11, 142 N.M. 235, 164 P.3d 934 (internal quotation marks and citation omitted). To ascertain legislative intent, we look first to the plain meaning of the words of the statute. *See State v. Tsosie*, 2011-NMCA-115, ¶ 13, 150 N.M. 754, 266 P.3d 34 ("We determine legislative intent by first looking at the words chosen by the Legislature and the plain meaning of those words." (alteration, internal quotation marks, and citation omitted)).

{35} We frequently use dictionary definitions to assist in determining the plain meaning of statutory language. *See, e.g.*, *State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830 ("Under the rules of statutory construction, [the appellate courts] first turn to the plain meaning of the words at issue, often using the dictionary for guidance."). Dictionary definitions of the word "successful" include, "resulting or terminating in success: having the desired effect[,]" *Webster's Third New International Dictionary of the English Language Unabridged* 2282 (3d ed. 1993), and "accomplishing an aim or purpose[.]" *New Oxford American Dictionary* 1737 (3d ed. 2010). These definitions, as well as the context in which the word "successful" is used in the statute, appear to evince a legislative intent to award attorney fees generated during

litigation that secures production of previously denied responsive documents. *See* § 14-2-12(D); *Rio Grande Sun v. Jemez Mountains Pub. Sch. Dist.*, 2012-NMCA-091, ¶ 9, 287 P.3d 318 (holding that "the party who unsuccessfully resists a statutorily-compelled, socially beneficial action" is subject to an award of attorney fees); *see also Faber v. King*, 2015-NMSC-015, ¶ 31, 348 P.3d 173 (stating that a "successful litigant . . . obtain[s] the documents he or she sought in the first place").

{36}    Appellant's argument that the production of documents already in Appellee's possession cannot form the basis of "successful" IPRA litigation harkens back to our appellate courts' application of the "rule of reason" in IPRA litigation, an option now foreclosed by our Supreme Court. *See Republican Party of N.M.*, 2012-NMSC-026, ¶ 16 ("[C]ases applying the 'rule of reason' to all of the exceptions enumerated by the Legislature are overruled to the extent they conflict with this [o]pinion.").

{37}    Section 14-2-1(A), which provides public policy exceptions to IPRA's disclosure requirements, does not include prior possession as a legitimate ground for withholding public records. *See Republican Party of N.M.*, 2012-NMSC-026, ¶ 16 ("[C]ourts now should restrict their analysis to whether disclosure under IPRA may be withheld because of a specific exception contained within IPRA[.]"). Appellant cites no cases supporting the proposition that an IPRA litigant's possession of a public record negates an agency's duty to respond. *See In re Adoption of Doe*, 1984-

NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("[Our appellate courts] assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority.").

{38} Additionally, we disagree with Appellant's position that IPRA's sole purpose is to make government records—that is, the tangible documents—available to the public. Section 14-2-5 of IPRA provides that "the intent of the [L]egislature in enacting [IPRA] is to ensure . . . that all persons are entitled to the greatest possible *information* regarding the affairs of government[.]" (Emphasis added.) While information can come in the form of tangible documents, it can also be gathered based upon an agency's denials. *See* § 14-2-11(B) ("If a written request has been denied, the custodian shall provide the requester with a written explanation of the denial."). Denials are valuable information-gathering tools. With respect to any given record request, the absence of either (1) production of responsive records or (2) a conforming denial based upon a valid IPRA exception sends a strong message to the requester that no responsive public record exists.

{39} Our independent review reveals that numerous other state courts interpret their own public records legislation to require production of responsive documents under these circumstances. *See, e.g.*, *Wichita Eagle & Beacon Pub. Co. v. Simmons*, 50 P.3d 66, 87 (Kan. 2002) (holding that a governmental agency may not "refuse to produce

20

records because such records are available from another or a more 'appropriate' source"); *Smith v. Sch. Dist. No. 45*, 666 P.2d 1345, 1349 (Or. Ct. App. 1983) (holding that a "public body may not refuse to produce records subject to inspection under [the act] just because the requester already possesses them"); *Neighborhood All. of Spokane Cty. v. Cty. of Spokane*, 261 P.3d 119, 131 (Wash. 2011) (holding that "[t]he fact that the requesting party possesses the documents does not relieve an agency of its statutory duties").

{40}     As late as January 16, 2013, the district court ordered Appellant to verify by affidavit that all responsive emails to Appellee's IPRA requests had been produced. Appellant continued to withhold the Colorado emails until June 5, 2013. Because Appellee's litigation secured the production of previously denied responsive public records, the litigation was "successful" as that word is used in the statute. *See* § 14-2-12(D).

**REASONABLENESS OF ATTORNEY FEES IN IPRA LITIGATION**

{41}     IPRA's enforcement provision also requires courts to grant only "reasonable" attorney fees to successful litigants. *See* § 14-2-12(D) ("The court shall award damages, costs and *reasonable* attorney[] fees[.]" (emphasis added)). The reasonableness of attorney fees is measured against an established set of objective

21

standards and criteria. *Behrens v. Gateway Court, LLC*, 2013-NMCA-097, ¶ 34, 311 P.3d 822. These standards and criteria include:

> (1) the time and labor required—the novelty and difficulty of the questions involved and skill required; (2) the fee customarily charged in the locality for similar services; (3) the amount involved and the results obtained; (4) the time limitations imposed by the client or by the circumstances; and (5) the experience, reputation and ability of the lawyer or lawyers performing the services.

*Rio Grande Sun*, 2012-NMCA-091, ¶ 13 (internal quotation marks and citation omitted). These criteria relate generally to mathematic calculations that a district court must conduct in the face of competing arguments by the parties: (1) what hourly rate is the lawyer entitled to per hour, (2) how many hours should the project require, and (3) what do other lawyers bill for similar work? *See id.* These quantitative questions are not at issue in this case. Instead, Appellant's challenge is to the reasonableness of the litigation itself after May 25, 2012—an overarching notion that must be addressed through evaluation of the "results obtained" in the litigation. *Id.* A factual determination by the district court that an IPRA fee request is reasonable when weighed against the results obtained in the litigation will be disturbed only when the award "is contrary to logic and reason." *Id.* ¶ 10 (alteration, internal quotation marks, and citation omitted).

{42}     The purpose of IPRA's enforcement provision is to "promote compliance and accountability" from governmental entities. *Faber*, 2015-NMSC-015, ¶ 28. The

22

provision effectively amounts to a "fee-shifting statutory scheme[]" that "encourages individuals to enforce IPRA on behalf of the public" and "ensure[s] that the entire process is virtually costless to a successful litigant." *Id.* ¶¶ 31-32 (internal quotation marks and citation omitted).

{43} Appellant's brief in chief correctly notes that "fees incurred in obtaining documents from a state agency are prima facie reasonable." Appellant then argues that Appellee's prosecution of the IPRA litigation after May 25, 2012 was not directed at obtaining public records, but instead it was "expended in an effort to verify (or disprove) the sworn assertions of the Secretary of State's Office that it had fully responded to Appellee's IPRA request." To summarize this argument, Appellant stated, "it is flatly unreasonable for a state agency to pay the freight for an IPRA litigant's paranoia."

{44} The obvious problem with Appellant's argument is that Appellee was not being paranoid; Defendants were withholding responsive documents. *See, e.g.*, *Cox v. N. M. Dep't of Pub. Safety*, 2010-NMCA-096, ¶ 17, 148 N.M. 934, 242 P.3d 501 ("New Mexico's policy of open government is intended to protect the public from having to rely solely on the representations of public officials that they have acted appropriately." (internal question marks and citation omitted)). From the initial complaint onward, Appellee claimed that Defendants were wrongfully withholding

23

the Colorado emails. Defendants' answer essentially acknowledges their possession of the Colorado emails. Despite repeated references to the Colorado emails by Appellee throughout the litigation, Defendants failed to fully produce the records until June 5, 2013. As such, Appellant's argument that Appellee's litigation efforts were motivated by goals other than obtaining public records, or by mere paranoia, is not legally sound.

{45}     Appellant claims that the Colorado emails are not responsive to Appellee's IPRA request. As discussed above, we disagree. But to be clear, this opinion does not hold that a governmental entity is required to produce records that it, in good faith, believes to be unresponsive. However, when such withheld records are subsequently revealed and determined to be responsive, those records may become the basis for an award of attorney fees in IPRA litigation. Our IPRA jurisprudence contemplates in camera review in circumstances in which the applicability of a disclosure exception is in question. *See Republican Party of N.M.*, 2012-NMSC-026, ¶ 49 ("Where appropriate, courts should conduct an in camera review of the documents at issue as part of their evaluation of privilege."). We see no language in the statute or our case law that would prohibit a similar practice with respect to a question of responsiveness.

24

{46} Appellee's assessment of the veracity of Defendants' claim that all responsive documents had been produced was likely, and understandably, colored by Defendants' initial and ongoing failure to produce the Colorado emails. Against this backdrop, Defendants' subsequent conduct justified Appellee's continued efforts to determine the existence of responsive records.

{47} Two examples stand out to this Court. First, early in the litigation, great confusion—among both the parties and within the Secretary of State's Office—arose as to the existence of the list of 117 and the list of 37. Defendants created this confusion by including these lists in its IPRA privilege log despite later revelations that the lists did not physically exist. While mistakes happen during the course of litigation, it is difficult to comprehend how documents that do not exist in tangible form could appear on an IPRA privilege log; a log that exists solely to request that tangible documents be protected from public disclosure. This confusion could justifiably raise Appellee's concerns as to the reliability of Defendants' claims of full production. Second is Appellant's submission of a non-responsive affidavit in response to the district court's order aimed, presumably, at curtailing this litigation. On August 17, 2012, the district court issued an order requiring that Appellant (1) produce all emails responsive to Appellee's IPRA requests and (2) provide an affidavit stating that no additional responsive emails exist. In response, Appellant

25

submitted an affidavit stating, essentially, that she, individually, did not send or receive any responsive emails. This affidavit failed to comply with the district court's order, and thereby, its deficiencies raised legitimate questions as to whether other documents existed.

{48} Given both the responsiveness of the Colorado emails and the confusion created by Defendants' conduct throughout the litigation, we cannot say that the district court's ruling as to the reasonableness of the fees generated by Appellee during the litigation constituted an abuse of discretion. Because Appellee's actions were reasonable, the district court's award of attorney fees for the period of time between May 25, 2012 and the conclusion of the litigation is consistent with the enforcement provision of IPRA.

**THE IMPACT OF A SETTLEMENT OFFER ON THE ACCRUAL OF ATTORNEY FEES IN IPRA LITIGATION**

{49} On September 29, 2011, Appellee sent a letter to Defendants for the purpose of "exploring settlement possibilities[.]" This letter was expressly not an offer of settlement but presented conditions under which Appellee would consider settlement. Nearly a year later, Appellee sent a new letter in conformance with Rule 11-408 NMRA that offered to settle the litigation if Defendants complied with five conditions. Two of the five conditions required that Defendants acknowledge "that there are no records that prove that 117 foreign nationals were illegally registered to

26

vote in New Mexico elections" and "that there are no records that prove that thirty-seven (37) foreign nationals had voted in New Mexico elections" as indicated in Appellant's March 15, 2011 statement. Appellant argues that no additional attorney fees should have accrued following Appellee's settlement offer because the terms of the offer did not require that Defendants produce additional responsive records.

{50} "It is the policy of the law and of the State of New Mexico to favor settlement agreements." *Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.*, 1988-NMSC-010, ¶ 3, 106 N.M. 705, 749 P.2d 90. Settlements entered by the parties "essentially represent contractual agreements." *Lewis v. City of Santa Fe*, 2005-NMCA-032, ¶ 11, 137 N.M. 152, 108 P.3d 558. A valid contract must be supported by an offer, acceptance, consideration, and mutual assent. *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 28, 303 P.3d 814. While consideration is an essential component to any contract, courts generally do not weigh the terms of a contract in determining its validity. *See Figueroa v. THI of N.M. at Casa Arena Blanca, LLC*, 2013-NMCA-077, ¶ 18, 306 P.3d 480 ("[E]very person . . . is entitled to dispose of his property in such manner and upon such terms as he chooses; and whether his bargain be wise and discreet or otherwise, or profitable or unprofitable, are considerations not for the courts of justice, but for the party himself to deliberate upon." (internal quotation marks and citation omitted)).

27

{51} Appellant appears to argue that the terms of Appellee's settlement offer indicate that Appellee was abusing the IPRA process to extricate inherently political statements. We disagree. The record before this Court indicates that Appellee believed it was entitled to certain public records in Defendants' possession and was willing to negotiate away that right in exchange for alternate concessions.

{52} Even if Appellant's assertion were correct, it does not provide legal support for terminating the accrual of attorney fees after the settlement offer in this case. Nothing precludes an IPRA request from being motivated by something other than a desire to possess the tangible document that is delivered by the responding governmental entity. This fact does not diminish a party's right to the tangible document or to leverage that right in settlement negotiations.

{53} Defendants declined to accept the terms of the settlement offer. As such, Appellee was entitled to continue litigating in order to secure all records responsive to its IPRA requests. Naturally, additional attorney fees accrued during the pendency of the litigation. Neither our independent research, nor Appellant's briefing, establishes legal support for the proposition that the terms of a settlement offer must be inherently connected to the substantive law from which a claim arises. *See In re Doe*, 1984-NMSC-024, ¶ 2 ("[Our appellate courts] assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find

28

any supporting authority."). Appellee is entitled to attorney fees accrued after Defendants rejected Appellee's settlement offer.

**ABUSE OF DISCRETION**

{54} Because we see no misapplication of law in the district court proceedings, we review the district court's award of attorney fees for abuse of discretion. The district court's order expressly stated that "counsel's hours spent in this case for which [Appellee] seeks compensation were all reasonable and necessary to [Appellee's] successful prosecution of this IPRA lawsuit." Appellee expended resources throughout the litigation in an effort to force the production of responsive records. Appellee's efforts were successful and culminated in the final production of responsive records on June 5, 2013. We cannot conclude that the district court's award of attorney fees was "clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims*, 1996-NMSC-078, ¶ 65.

**CONCLUSION**

{55} Because the district court's award of attorney fees did not constitute an abuse of discretion, we affirm. Additionally, we conclude that Appellee is entitled to appellate attorney fees and remand to the district court for proceedings consistent with this conclusion.

{56}    **IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**TIMOTHY L. GARCIA, Judge**

30